

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

---

NO. 2-07-272-CR

---

KOREY DEMAINE WALKER                                        APPELLANT

V.

THE STATE OF TEXAS                                                STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

------------

## OPINION

------------

### I. Introduction

Appellant Korey Demaine Walker appeals his conviction and sixty year

sentence for attempted capital murder.[1]  *See* Tex. Penal Code Ann. § 15.01

---

[1] ... This was appellant's second trial on the same charge.  This court reversed appellant's original conviction for error in the jury charge and remanded the case to the trial court for a new trial.  *See Walker v. State*, No. 02-04-00491-CR, 2006 WL 908698 (Tex. App.—Fort Worth April 6, 2006, pet. ref'd).

(Vernon 2003), § 19.03 (Vernon Supp. 2009).  In four points, appellant asserts that the trial court violated his Sixth Amendment right to confrontation and the right to expose bias on the part of a witness under Texas Rule of Evidence 613(b) by refusing to allow a line of questioning, that the trial court erred by failing to include a mistake of fact instruction in its instruction on self-defense, and that the trial court erred by providing an incomplete and ineffective limiting instruction regarding prior inconsistent statements used for impeachment purposes by a State's witness.  We affirm.

## II.  Background

### A.  The Shooting

On May 8, 2002, appellant pled guilty to possession of more than four but less than two hundred grams of a controlled substance.  Appellant did not appear at his January 10, 2003 sentencing hearing, so the trial court forfeited his bond and issued a warrant for his arrest.

Tarrant County Sheriff's Department Deputy Andrew Tatsch, who was charged with executing appellant's warrant, received new information regarding appellant's whereabouts from appellant's girlfriend, Joyce Williams, on September 11, 2003.[2]  The trial court changed the address of the warrant, and

---

[2] ... Joyce Williams was appellant's girlfriend at the time of the incident, but by the time of the trial, she was his wife—Joyce Williams Walker.

Deputy Tatsch arranged for three other deputies, Deputies Hernandez, Johnston, and Pickle, to assist him in executing it. They met at a Costco near appellant's apartment at 6:00 a.m. on September 12, 2003, for a briefing with Deputy Tatsch. At the briefing, each deputy saw a photograph of appellant.

The deputies arrived at appellant's apartment around 6:45 a.m. Over the next forty-five minutes to an hour, the deputies intermittently knocked on the front door and announced their presence, getting progressively louder to the point of banging on the door and yelling for appellant to come out. Appellant never answered the door, but Deputies Hernandez, Johnston, and Pickle each independently noticed what they believed to be someone looking through the blinds.

When appellant did not come to the door, the deputies asked the apartment complex to bring a key to unlock appellant's front door. Jess Cross, the apartment complex's maintenance technician, arrived at appellant's apartment around 8:00 a.m. and gave the key to the deputies. The deputies had contacted a supervisor, Sergeant White, who arrived about the same time. When appellant still did not come to the door, the deputies used the key to attempt to open the door, but the door was locked from the inside with a keyless deadbolt.

3

Sergeant White authorized the deputies to breach the door by force. The deputies knocked at least one to two more times, and when there was still no response, Deputy Tatsch used a ram and forced the door open. Deputies Tatsch and Johnston entered the apartment first, followed by Deputy Hernandez and Sergeant White. Once inside, Deputy Tatsch announced his presence, stating, "sheriff's department, felony warrant."

The deputies made their way to the closed bedroom door. Deputy Tatsch kicked open the door. As the door slammed back shut, a shot was fired, and Deputy Tatsch was hit by the bullet.[3] Although Deputy Tatsch did not see a muzzle flash from a gun, he did see appellant crouched down by the bed in the bedroom, and he felt the blast hit him. Deputies Tatsch and Johnston returned fire through the closed door. The two deputies then retreated around a corner as Deputy Hernandez, who was by the front door, called to Deputy Pickle to get an ambulance. Deputy Johnston testified that appellant, holding a gun in front of him, walked over to where Deputy Johnston was lying on the floor, then,

---

[3] There was conflicting testimony about when the first shot was fired. Sergeant White testified that the shot was fired immediately as the door was kicked open. Deputy Tatsch testified that the shot was fired before the door closed. Deputy Hernandez testified that the first shot was fired through the closed door. Cross, the apartment maintenance technician, testified that from his vantage point outside the apartment, he saw a muzzle-flash from the living room area where the deputies were that coincided with the first shot he heard.

4

after Deputy Johnston shot at him, kept going toward the door where he collapsed. Deputy Hernandez testified that when he looked back into the apartment, he saw appellant leaving the bedroom with a gun in his hand. Fearing for his life, Deputy Hernandez shot appellant twice. All of these events lasted approximately seventeen seconds.

After the shooting was over and appellant was subdued, Deputy Tatsch was taken to a hospital, where he was treated for his gunshot injuries. The surgeon who operated on Deputy Tatsch testified that he would have died without the surgery. Appellant was treated for his injuries at the scene and then taken into custody.

After the incident was over, the deputies and Sergeant White were separated, and detectives from the Fort Worth Police Department interviewed each of them independently. The police department conducted criminal and administrative investigations but did not file charges against any of the officers from the sheriff's department.

B.  Trial proceedings

A grand jury indicted appellant for attempted capital murder and two counts of aggravated assault. Appellant pled not guilty at the outset of his trial. During cross-examination, appellant's counsel asked Sergeant White questions about the investigation following the incident. Appellant asked whether

Sergeant White had an attorney present when he gave his statement to Detective Jamison, a detective for the major case unit of the Fort Worth Police Department. After Sergeant White admitted that a CLEET attorney was present, appellant asked Sergeant White if he knew about his *Garrity* rights.[4] The prosecutor objected to the question on relevance grounds. After hearing arguments on the issue, the trial court sustained the objection; appellant made a bill for appellate review. During the questioning under the bill, Sergeant White testified that he did not invoke his *Garrity* rights. Appellant attempted to impeach this claim by showing that before his interview with Detective Jamison, Sergeant White read a card provided by the attorney, who was present during the interview, that stated he reserved his right to remain silent under the Fifth and Fourteenth Amendments and that "this is *Garrity*." But Sergeant White testified that he did not think this meant he invoked his *Garrity* rights because he gave a statement anyway.

The State also called Katrina Smith as a witness. Smith dated appellant before the incident, but continued to stay in contact with appellant after their

---

[4] ... The *Garrity* doctrine comes from the holding of the Supreme Court case of *Garrity v. New Jersey*, 385 U.S. 493, 87 S. Ct. 616 (1967). It protects an officer who is required to make incriminating statements as part of an investigation by excluding the officer's statements from use in a future prosecution of that officer. *Id.* at 500, 87 S. Ct. at 620.

relationship ended.  Smith testified that appellant called her at 7:00 a.m. on the morning of the shooting and they had talked.  Smith also testified that at some point that same morning, she had listened to a voicemail message from appellant in which he asked if she had sent the police to his apartment.  But Smith testified that when she and appellant talked that morning, they did not discuss the police at all.  The State asked Smith if she recalled statements that she had made to the police detective about the phone conversation she had with appellant.  Appellant objected to the question and requested a limiting instruction to Smith's anticipated answer because appellant believed the prosecutor was attempting to impeach Smith by using a prior inconsistent statement.  At this time, appellant submitted a limiting instruction to the trial judge, who read parts of the instruction to the jury before the questioning resumed.  The trial judge admonished the jurors that impeachment testimony should be used to assess credibility.  The judge declined to instruct the jury, as appellant requested, that impeachment testimony cannot be used to determine guilt or innocence and can only be used to assess credibility.

As part of the prosecutor's efforts to impeach Smith, the State also asked her about other prior inconsistent statements she made to the prosecutor. Appellant requested that the trial court provide another limiting instruction to apply to prior statements made to the prosecutor.  The trial court instructed the

jury that the previous limiting instruction again applied and should be used to assess Smith's credibility. The trial court again declined to instruct the jury that impeachment testimony only applies to credibility and cannot be used to determine guilt or innocence.

Later, still on direct, Smith testified that she recalled appellant indicating to her at least a couple of days before the offense that he wanted to die and that he would not be seeing her anymore. The State also asked if appellant sounded serious when he told Smith those things. Appellant objected, and at a bench conference, the State urged "that this was a suicide by cop and that he was not coming out and he is calling and saying his good-byes. So this goes to his mental state." But the trial court sustained appellant's objection. Even though the jury did not hear Smith's answer, one of the prosecutors briefly referred to the "suicide by cop" theory in her closing.[5]

During the charge conference, appellant objected to the trial court's proposed charge on several grounds. One objection was that a mistake of fact instruction should have been included in the self-defense application paragraph.

_____

[5] Specifically, she argued, "This man is responsible for what happened that day. He decided it was suicide by cop. That's how he was going to go out, shooting it out with the police." Later, she continued, "They want to make a big deal about him not flushing the drugs [that were later found in the apartment] . . . . That's because he had made the decision to fight. He had made the decision to shoot it out. He wasn't going back."

8

Appellant argued that the mistake of fact defense applies not only to the elements of the charged offense, but also to the defense of self-defense, which is not available when an actor knows a peace officer is effecting an arrest. Appellant requested language stating that the jury should find in his favor on the element of self-defense if he was mistaken as to the identity of the peace officer. After argument, the trial court denied appellant's proposed instruction.

Appellant also objected to the trial court's instruction that Smith's impeachment testimony could be considered for credibility purposes "and for no other reason." Appellant requested that the charge further instruct the jury that they could not consider the impeachment testimony for purposes of determining guilt or innocence. The trial court denied the proposed instruction.

The jury returned a verdict of guilty on the charge of attempted capital murder and assessed punishment at sixty years' confinement. The trial court imposed a sentence in accordance with the verdict. Appellant timely filed his notice of appeal.

III. The Right to Confrontation and the Right to Expose a Witness's Bias

In his first two points, appellant challenges the trial court's decision to limit the cross-examination of Sergeant White as a violation of the Confrontation Clause and Texas Rule of Evidence 613(b). We consider both points together because the legal issues are intertwined.

A.  Standard of review

We review a "trial court's decision to limit cross-examination of a witness regarding credibility" for an abuse of discretion.  *Pope v. State*, 161 S.W.3d 114, 123 (Tex. App.—Fort Worth 2004), *aff'd*, 207 S.W.3d 352 (Tex. Crim. App. 2006), *cert. denied*, 549 U.S. 1350 (2007).  A court abuses its discretion when its decision goes beyond the "zone of reasonable disagreement."  *Green v. State*, 934 S.W.2d 92, 101–02 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1200 (1997).

B.  Applicable law

The Confrontation Clause protects the right of an accused to confront any witnesses that are against him.  U.S. Const. amend. VI; *Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000).

> Confrontation means more than being allowed to confront the witness physically.  A primary interest secured by the Confrontation Clause is the right of cross-examination.  Each Confrontation Clause issue must be weighed on a case-by-case basis, carefully taking into account the defendant's right to cross-examine and the risk factors associated with admission of the evidence.  In weighing whether evidence must be admitted under the Confrontation Clause, the trial court should balance the probative value of the evidence sought to be introduced against the risk its admission may entail.

*Lopez*, 18 S.W.3d at 222 (footnotes omitted).

Exposing a witness's motivation or bias in testifying is one of the foundational purposes of the Confrontation Clause and the right to cross-examination. *Davis v. Alaska*, 415 U.S. 308, 316–17, 94 S. Ct. 1105, 1110 (1974). Defendants have the right to inquire into any area reasonably calculated to reveal a witness's motives, biases, and interests in testifying. *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996) (citing *Lewis v. State*, 815 S.W.2d 560, 565 (Tex. Crim. App. 1991), *cert. denied*, 503 U.S. 920 (1992)). As part of the right to confrontation, the defendant may seek to impeach or discredit a witness. *Pope*, 161 S.W.3d at 124 ("This includes impeaching the witness with relevant evidence that might reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or evidence that might go to any impairment or disability affecting the witness's credibility." (citing *Davis*, 415 U.S. at 316, 94 S. Ct. at 1110)). A result of the Confrontation Clause is that a defendant's right "to cross-examine a . . . witness extends to any matter that could reflect on the witness's credibility." *Id.* (citing *Virts v. State*, 739 S.W.2d 25, 28–29 (Tex. Crim. App. 1987)). Thus, the trial court should give the defendant great latitude to reveal any relevant facts that reflect on the credibility of the witness. *Id.* For purposes of witness credibility, "the test of relevancy is not whether the answer sought will expound any of the main issues, but whether it will aid the court or jury in

11

appraising the credibility of the witness and assessing the probative value of the direct testimony." *McDaniel v. State*, 3 S.W.3d 176, 180 (Tex. App.—Fort Worth 1999, pet. ref'd).

The Court of Criminal Appeals recently held that

[t]he possible animus, motive, or ill will of a prosecution witness who testifies against the defendant is never a collateral or irrelevant inquiry, and the defendant is entitled, subject to reasonable restrictions, to show any relevant fact that might tend to establish ill feeling, bias, motive, interest, or animus on the part of any witness testifying against him.

*Billodeau v. State*, 277 S.W.3d 34, 42–43 (Tex. Crim. App. 2009) (citing *London v. State*, 739 S.W.2d 842, 846 (Tex. Crim. App. 1987)). *Billodeau*, however, does not hold that a defendant can explore every possible line of inquiry. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 294 (1985). The Supreme Court of the United States has stated that the right to cross-examine a witness is not without limits:

It does not follow, [however], that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the

12

witness' safety, or interrogation that is repetitive or only marginally relevant.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986); *see Lopez*, 18 S.W.3d at 222 ("The trial court maintains broad discretion to impose reasonable limits on cross-examination to avoid harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence."); *Felan v. State*, 44 S.W.3d 249, 254 (Tex. App.—Fort Worth 2001, pet. ref'd) ("The court may properly limit the scope of cross-examination to avoid harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence." (citing *Lagrone v. State*, 942 S.W.2d 603, 613 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997)); *Garza v. State*, 18 S.W.3d 813, 821 (Tex. App.—Fort Worth 2000, pet. ref'd)).

Confusion of the issues "refers to a tendency to confuse or distract the jury from the main issue of the case." *Gigliobianca v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). Unless the inquiry on cross-examination is addressing an issue that relates to the charged offense or the credibility of the witness, "allowing a party to delve into the issue beyond the limits of cross-examination wastes time and confuses the issue." *Hayden v. State*, No. PD-0860-07, 2009 WL 928569, at *4 (Tex. Crim. App. Apr. 8, 2009).

13

Accordingly, a trial court abuses its discretion when it denies a defendant the opportunity "to show a prototypical form of bias on the part of the witness" through cross-examination. *Felan*, 44 S.W.3d at 254 (citing *Lagrone*, 942 S.W.2d at 613).

C.  Analysis

At trial, Appellant attempted to cross-examine Sergeant White about having an attorney present during the Fort Worth Police Department's investigation following the shooting.  Appellant hoped to demonstrate that Sergeant White invoked his *Garrity* rights.  The *Garrity* doctrine protects an officer who is required to make incriminating statements as part of an investigation by excluding the officer's statements from use in a future prosecution. Appellant believed that Sergeant White's invocation of his *Garrity* rights during the investigative interview indicated that Sergeant White knew he had engaged in wrongdoing and, therefore, that he had a bias and a motive to testify untruthfully.  *See Garrity*, 385 U.S. at 500, 87 S. Ct. at 620.  Although the trial court sustained the State's relevancy objection and prevented appellant from inquiring into whether Sergeant White invoked his *Garrity* rights, it did not prevent appellant from questioning Sergeant White about any potential bias or improper motive; the court precluded appellant from questioning Sergeant White only about a very narrow issue.  Appellant was still permitted to demonstrate

that Sergeant White had an attorney present during his interview, to bring to light the fact that there was an investigation by the Fort Worth Police Department, and to emphasize the difference in testimony between Sergeant White and the other deputies.[6]

A trial court has the discretion to limit testimony that may confuse the issues or be only marginally relevant. *Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435; *Felan*, 44 S.W.3d at 254 (citing *Lagrone*, 942 S.W.2d at 613). Whether Sergeant White may have invoked his *Garrity* rights is only a marginally relevant issue and does not necessarily indicate that he had a reason

---

[6] After the trial court refused to allow questions about *Garrity*, appellant attempted to ask Sergeant White what CLEET is, the organization that provided the attorney to Sergeant White. The State, as with the *Garrity* question, objected to the relevance of the question, and the trial court sustained the objection. This was after appellant had already established the fact that Sergeant White had an attorney present during the investigation. Although appellant states in his brief that the trial court abused its discretion by curtailing this line of questioning as well, it is unclear whether he seeks reversal on that issue. Nevertheless, for the same reasons that we find no abuse of discretion in the relevancy determination made by the trial court concerning *Garrity*, we decline to hold that the trial court abused its discretion by refusing to allow questions concerning CLEET, which is the "fraternal advisory board for police officers in the State of Texas." *See* Tex. R. App. P. 38.9 (providing that we are to construe briefs liberally); *Barnett v. State*, 161 S.W.3d 128, 132 (Tex. App.—Fort Worth 2005), *aff'd*, 189 S.W.3d 272 (2006). We cannot discern any reason why the identity of the organization that provided Sergeant White's attorney would have any bearing on whether Sergeant White had a potential bias or motive to testify untruthfully. Therefore, we will not disturb the trial court's determination. *See Green*, 934 S.W.2d at 101–02.

to provide false testimony. Rather, Sergeant White's possible invocation of *Garrity* would more likely indicate an intent to testify truthfully—even if that testimony could potentially implicate him in wrongdoing—because *Garrity* protects an officer from the future use of an incriminating statement. *See Garrity*, 385 U.S. at 500, 87 S. Ct. at 620. Because Sergeant White's testimony regarding *Garrity* would have been only marginally relevant and potentially confusing, we conclude and hold that the trial court's ruling is not beyond the zone of reasonable disagreement and, thus, that the trial court did not abuse its discretion by excluding the line of questioning. We overrule appellant's first two points.

## IV. Jury Instructions

In his third point, appellant contends that the trial court failed to properly instruct the jury because it did not include a mistake of fact defense instruction in the application paragraph of the self-defense instruction to the jury. In his fourth point, appellant challenges the efficacy of the limiting instructions given during the trial and provided in the jury charge.

### A. Standard of review

Appellate review of error in a jury charge or instruction to the jury involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we must determine whether error occurred. If so,

16

we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32. Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be some harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 2007); *Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Minor v. State*, 91 S.W.3d 824, 827–29 (Tex. App.—Fort Worth 2002, pet. ref'd) (applying analysis). In other words, a properly preserved error will require reversal as long as the error is not harmless. *Almanza*, 686 S.W.2d at 171. In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*; *see also Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

B. Mistake of Fact and Self-Defense

1. Applicable law

A trial court does not commit error when the jury charge accurately states the law. *Taylor v. State*, 148 S.W.3d 592, 595 (Tex. App.—Fort Worth 2004, pet. ref'd). A defendant "has the right to an instruction on any defensive issue

raised by the evidence, whether such evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of this evidence." *Miller v. State*, 815 S.W.2d 582, 585 (Tex. Crim. App. 1991); *Bell v. State*, 169 S.W.3d 384, 394–95 (Tex. App.—Fort Worth 2005, pet. ref'd). When the defendant raises the issue of mistaken belief at trial, "he is entitled to a defensive instruction of 'mistake of fact.'" *Miller*, 815 S.W.2d at 585. A defendant also has a right to an instruction on self-defense when he raises that issue at trial. *Id.*

2.  Analysis

The Texas Penal Code provides in part: "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a) (Vernon Supp. 2009). Furthermore, "[t]he use of force against another is not justified: to resist an arrest . . . that the actor knows is being made by a peace officer." *Id.* § 9.31(b)(2). "'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42) (Vernon Supp. 2009).

Because there was evidence at trial suggesting that appellant acted in self-defense and that appellant had a mistaken belief as to the identity of the

18

deputies who forcibly entered his apartment, appellant was entitled to have an instruction on these defenses. *See Miller*, 815 S.W.2d at 585. Accordingly, the trial court provided instructions to the jury about self-defense and mistake of fact.[7] The trial court's definition of "reasonable belief"

---

[7]... The trial court provided the following instruction on self defense:

> Upon the law of self-defense, you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other person's use or attempted use of unlawful force.

> The use of force against another is not justified to resist an arrest that the actor knows is being made by a peace officer.

> . . . .

> "Reasonable belief" means a belief that would be held by an ordinary and prudent man in the same circumstance as the actor.

> . . . .

> When a person is attacked with unlawful deadly force, or is subject to an attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury, then the law justifies such person in resorting to deadly force when and to the degree that he reasonably believes the deadly force is immediately necessary, to protect himself from another's use or attempted use of unlawful deadly

19

force.

. . . .

Now, if you find from the evidence beyond a reasonable doubt that on the occasion in question, the defendant, Korey Demaine Walker, committed the offense of attempted capital murder or aggravated assault as charged in the indictment or any lesser included charge, but you further have a reasonable doubt from the evidence that Korey Demaine Walker reasonably believed that his life or person was in danger and reasonably believed that the use of deadly force on his part was immediately necessary to protect himself against A.M. Tatsch's use or attempted use of unlawful deadly force and that his use of force was not for the purpose of resisting arrest that the defendant knew was being made by a peace officer, he shot A.M. Tatsch with a firearm . . . then you shall acquit the defendant on the grounds of self-defense . . . .

In a separate paragraph, immediately following the instruction on self-defense, the trial court provided the following instruction on mistake of fact:

It is a defense to prosecution that the defendant, through mistake, formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for the commission of the offense. 'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor.

Therefore, if you have a reasonable doubt from the evidence whether on the occasion in question the defendant, Korey Demaine Walker, through mistake, formed a reasonable belief that A.M. Tatsch was not a peace officer . . . lawfully discharging an official

tracked the statutory language verbatim. *See* Tex. Penal Code Ann. § 1.07(a)(42). Similarly, the trial court's definitions of self-defense and mistake of fact are virtually identical to those in the statute. *See id.* §§ 8.02(a), 9.31(a), (b)(2). While not included in the self-defense specific paragraph, the mistake of fact instruction was included in the general application paragraph.

Appellant's requested instruction required the jury to find that his use of force was not for the purpose of resisting an arrest he knew was being made by a peace officer if the jury had reasonable doubt as to whether appellant was mistaken about Deputy Tatsch's identity as a peace officer. Such an instruction was not necessary, however. The State had the burden of proving its own case beyond a reasonable doubt, which necessarily required the State to convince the jury that appellant's account of the event was incorrect. *See Zuliani v. State*, 97 S.W.3d 589, 594–95 (Tex. Crim. App. 2003); *Dotson v. State*, 146 S.W.3d 285, 291 (Tex. App.—Fort Worth 2004, pet. ref'd). If the jury had believed that appellant mistakenly thought Deputy Tatsch was not a peace officer—and thus found him not guilty of the charged offenses as

---

duty, you will find the defendant not guilty of the offenses charged against him in the indictment and consider whether the defendant is guilty of a lesser included offense.

21

instructed by the trial court—it would not have been necessary for the jury to also then determine whether self-defense applied; the result would have been the same: an acquittal of the charged offenses. *See Allen v. State*, 253 S.W.3d 260, 263 (Tex. Crim. App. 2008). And it would likewise not have been necessary to so instruct the jury with respect to the charged lesser-included offenses of attempted murder, aggravated assault, and deadly conduct because, according to the charge, the jury was not to consider those offenses unless it had previously found that appellant did not know Deputy Tatsch was a peace officer; thus, according to the charge as written, the jury would still have been able to consider self-defense as to the lesser-included charges. Moreover, even if the refusal to include appellant's requested charge were error, it would be harmless because the jury obviously disbelieved appellant's testimony that he did not know Deputy Tatsch was a peace officer. *See Montgomery v. State*, 198 S.W.3d 67, 94 (Tex. App.—Fort Worth 2006, pet. ref'd). Because the charge as a whole correctly instructed the jury, we hold that the trial court did not err. We overrule appellant's third point.

## C. Limiting Instructions on Impeachment Testimony

In his fourth point, appellant challenges the trial court's denial of his proposed limiting instruction during trial and in the jury charge. Appellant asserts that the trial court, while providing a limiting instruction when it was

22

requested, did not provide a complete limiting instruction as to Smith's testimony. Appellant claims, and the dissent agrees, that because the jury was not specifically told to ignore the impeachment testimony for purposes of guilt-innocence, the jury could have convicted appellant by improperly considering the impeachment testimony.

### 1. Applicable law

Rule of evidence 105(a) provides that "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Tex. R. Evid. 105(a). Limiting instructions are most effective when they are simultaneously provided with the related evidence. *Rankin v. State*, 974 S.W.2d 707, 712 (Tex. Crim. App. 1996). Thus, when evidence is admitted for a limited purpose, the trial court must, upon request, provide a midtrial limiting instruction. *Id.*; *King v. State*, 189 S.W.3d 347, 356 (Tex. App.—Fort Worth 2006, no pet.); *see* Tex. R. Evid. 105(a). This is so because failing to provide the instruction may improperly result in the jury forming a negative inference about the defendant. *Jackson v. State*, 992 S.W.2d 469, 477 (Tex. Crim. App. 1999). And this improper inference, once formed, cannot easily be cured by an instruction in the jury charge. *Id.* When a defendant properly

23

requests a limiting instruction, trial courts should not have the discretion to provide the instruction at a less opportune time. *Rankin*, 974 S.W.2d at 712. If the defendant fails to request a limiting instruction at the introduction of the impeachment evidence, then the defendant does not preserve error and the trial court is not required to provide an instruction; the burden is on the defendant alone to request a limiting instruction. *Martin v. State*, 176 S.W.3d 887, 899 (Tex. App.—Fort Worth 2005, no pet.); *Cole v. State*, 46 S.W.3d 427, 432 (Tex. App.—Fort Worth 2001, pet. ref'd).

The Court of Criminal Appeals has long held as an established principle of law that when "it is necessary to charge in regard to the effect of impeaching testimony, the jury should be told that the evidence must be used for the purpose of affecting the credibility of the witness whose evidence is sought to be impeached." *Pratt v. State*, 50 Tex. Crim. 227, 230, 96 S.W. 8, 10 (1906); *see Gentry v. State*, 68 Tex. Crim. 567, 571, 152 S.W. 635, 637 (1912) (holding a limiting instruction sufficient that admonished the jury not to consider impeachment testimony as evidence against the accused, but only as evidence of the credibility of the witness); *Edmondson v. State*, 68 Tex. Crim. 113, 115, 150 S.W. 917, 918 (1912) ("Whe[n]ever impeaching testimony is admitted, it must be restricted by the court to the purpose for which it was admitted. If it was for the purpose of affecting his credibility as a witness

24

before the jury, that body must be instructed clearly that such is the purpose for which the evidence was introduced."); *Hunter v. State*, 59 Tex. Crim. 439, 455, 129 S.W. 125, 134 (1910).

In evaluating jury instructions, both oral and written, juries are "presumed to follow the trial court's instructions in the manner presented." *Kirk v. State*, 199 S.W.3d 467, 479 (Tex. App.—Fort Worth 2006, pet. ref'd); *see Young v. State*, 283 S.W.3d 854, 882 (Tex. Crim. App. 2009) (Cochran, J., concurring) ("We must, however, 'presume[] that jurors, conscious of the gravity of their tasks, attend closely [to] the particular language of the trial court's instruction[s] in criminal cases and strive to understand, make sense of, and follow the instructions given them.'" (quoting *Francis v. Franklin*, 471 U.S. 307, 324 n.9, 105 S. Ct. 1965, 1976 n.9 (1985)); *Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996). Courts will abandon this presumption only if there is evidence showing that the jury did not follow the instructions. *Williams*, 937 S.W.2d at 490.

2. Analysis

On direct, the State sought to impeach Smith by showing that she made inconsistent statements to Detective Jamison after the shooting. Upon appellant's objection, the trial court provided the following limiting instruction to the jury in court prior to Smith's answering any impeachment questions:

25

> You may use [impeachment testimony] to aid you, if it does aid you, in determining the credibility of the witness who is testifying. That's the purpose of impeaching testimony. And so your consideration of any different statements made outside of court is for the purpose of determining the credibility of the witness.

The trial court refused appellant's request for additional language in the in-court instruction admonishing the jury that it could not consider the impeachment testimony for purposes of the guilt-innocence determination. The trial court provided the same in-court instruction when the State sought to impeach Smith concerning prior statements made to the prosecutor. Furthermore, the court's jury charge included the following:

> You are instructed that the credibility of a witness may be impeached by showing that he has made other and different statements out of court from those made in court during the trial. . . . You are instructed that such testimony *may* be considered by you in determining, if it does so, the credibility and weight to be given to the testimony of the witness, Katrina Smith, *and for no other reason*. [Emphasis added.]

Appellant does not assert that he was denied a timely limiting instruction; rather, he asserts that the trial court's limiting instructions—both during trial and in the charge—were incomplete or inadequate. Appellant contends that the court only directed the jury to a permissible use of impeachment testimony rather than restricting the jury's use of that evidence to its only proper purpose.

Our analysis is guided by two principles that apply to jury instructions. First, courts cannot expect jurors "to know exactly how to use the evidence

26

unless [the courts] tell them." *Rankin*, 974 S.W.2d at 712. Second, juries are "presumed to follow the trial court's instructions in the manner presented." *Kirk*, 199 S.W.3d at 479. Without these two principles, our jury system would prove inoperable; every jury verdict could be subject to its own trial about whether each juror followed every instruction in every instance.

### a. Limiting instruction in the jury charge

A trial court must provide a limiting instruction that "restrict[s] the evidence to its proper scope." Tex. R. Evid. 105(a). While it is not necessary for the court to instruct the jury about the myriad of potential impermissible uses of limited purpose evidence, the court must, nonetheless, restrict the scope so that the evidence is considered only for its limited purpose.[8] *See,*

---

[8] Appellant relies exclusively on the court of criminal appeals's decision in *Rankin* in asserting that the trial court had a responsibility to further instruct the jury about the impermissible uses of impeachment testimony, specifically, that it may not be used to determine guilt. Appellant points to language in *Rankin* in which the court of criminal appeals states that Rule of Evidence 105(a) "'restrict[s] the evidence to its proper scope,' [and] does so as effectively as possible." *Rankin*, 974 S.W.2d at 712 (quoting Tex. R. Evid. 105(a)). Appellant asserts that the language, "as effectively as possible," requires courts to set all of the boundaries on the use of impeachment testimony by instructing juries about the correct *and* incorrect uses. But this is too broad a reading of *Rankin*. After it decided *Rankin*, the court of criminal appeals held that "the precise issue discussed [in *Rankin*] was whether the trial court had discretion to postpone giving a limiting instruction until the jury charge when the defendant had requested such an instruction at the time the evidence was admitted." *Hammock v. State*, 46 S.W.3d 889, 893 (Tex. Crim. App. 2001) (citing *Rankin*, 974 S.W.2d at 707). *Rankin* requires courts to

27

*e.g.*, *Pratt*, 50 Tex. Crim. at 230, 96 S.W. at 10. The limiting instruction in the jury charge specifically instructed the jury what Smith's impeachment testimony could be used for—to determine the credibility of Smith as a witness. The trial court then restricted the scope of that evidence by further instructing that it could be used "*for no other reason.*" [Emphasis added.] Thus, this jury charge instruction properly restricted the scope of the jury's use of the impeachment testimony so that the jury would not improperly consider Smith's inconsistent statements in its deliberations. *See Prescott v. State*, 744 S.W.2d 128, 133 & n.5 (Tex. Crim. App. 1988) ("Moreover, the [incomplete] limiting instruction given in the charge to the jury did not limit the use of the appellant's prior felony conviction *to impeachment only.*" (emphasis added)). The trial court was not required to further instruct the jury that it could not consider the impeachment testimony for purposes of determining guilt-innocence because that idea is implicit in the court's instruction that the impeachment testimony was to be used to determine credibility and "*for no other reason.*" [Emphasis added.] We hold that there was no error in the limiting instruction provided in the jury charge, and we overrule this portion of appellant's fourth point.

---

provide a contemporaneous limiting instruction when impeachment testimony is introduced and the defendant requests such an instruction so as to "restrict the evidence to its proper scope" by preventing the jury from improperly considering the evidence for a period of time. *Rankin*, 974 S.W.2d at 712.

b. In-court limiting instruction

Appellant also asserts that the trial court erred in its in-court limiting instruction when Smith's inconsistent statements were introduced. The trial court's instruction properly told the jury to consider Smith's inconsistent statements for credibility purposes. While this is a correct statement of the applicable law, the instruction is nevertheless incomplete because the trial court failed to provide any kind of restriction on the jury's use of the impeachment evidence as it ultimately did with its written jury charge instruction. *See* Tex. R. Evid. 105(a). In other words, the trial court's in-court instruction, unlike the jury charge instruction, instructed the jury about what it could consider impeachment testimony for, rather than instructing the jury that it could *only* consider impeachment testimony for one purpose. *Cf.* Tex. Gov't Code Ann. § 311.016(1) (Vernon 2005) (providing that, generally, in statutory construction, "may" creates discretionary authority or grants permission or power); *see generally U.S. v. Rodgers*, 461 U.S. 677, 706, 103 S. Ct. 2132, 2149 (1983) ("The word 'may' when used in a statute, usually implies some degree of discretion."). Thus, although the instruction given did not misstate the law, it failed to properly restrict the jury's use of Smith's impeachment testimony and thus constituted error.

29

Having found error, we proceed to conduct a harm analysis. *Abdnor*, 871 S.W.2d at 731–32. Because the trial court's error is nonconstitutional, we determine harm according to Texas Rule of Appellate Procedure 44.2(b). Tex. R. App. P. 44.2(b); *Lemmons v. State*, 75 S.W.3d 513, 524 (Tex. App.—San Antonio 2002, pet. ref'd); *Rankin v. State*, 995 S.W.2d 210, 215 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (op. on remand). We will disregard any error that does not affect a substantial right of the defendant. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); *Coggeshall*, 961 S.W.2d at 643. Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged

error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

The trial court's in-court instruction informed the jury that it could consider Smith's impeachment testimony for credibility purposes. Thus, even though the instruction was incomplete, the trial court did provide at least some guidance to the jury on the proper use of Smith's impeachment testimony. Although there is some indication that the jury was initially confused about how it could use the impeachment testimony—as evidenced by a note given to the judge during a break in the trial—that confusion nevertheless indicates that the jury realized there could be some kind of limitation on the purpose for which it could consider the testimony. Furthermore, the trial court clarified and corrected the instruction in the jury charge. Therefore, unlike the situation in which the trial court fails to give any midtrial limiting instruction, here, whatever misconceptions the jury may have had would likely have been corrected by this proper limiting instruction. Also, because the trial court provided the correct instruction to the jury immediately before it began deliberating, it would likely have been more influential in the jury's deliberations. Likewise, there is no indication that the jury had trouble following the proper instruction as given in the charge. *See Lemmons*, 75 S.W.3d at 525; *Rankin*, 995 S.W.2d at 215.

The dissent focuses on the State's apparent confusion about the significance of Smith's testimony. It does appear that the State attempted to rely on part of Smith's testimony as truthful in advancing the "suicide by cop" theory even after introducing her prior inconsistent statements, apparently in an attempt to impeach Smith's overall credibility as a witness. *See, e.g.*, *Del Carmen Hernandez v. State*, 273 S.W.3d 685, 689 (Tex. Crim. App. 2008) ("The theory of attack by prior inconsistent statements is not based on the assumption that the present testimony is false and the former statement true but rather upon the notion that talking one way on the stand and another way previously is blowing hot and cold, and raises a doubt as to the truthfulness of both statements."); *Lopez v. State*, 643 S.W.2d 431, 435 (Tex. App.—Corpus Christi 1982, no pet.) ("Impeachment is the introduction of prior inconsistent statements . . . to discredit a witness."). But, despite that apparent confusion, the State did not later impermissibly argue that the content of Smith's prior inconsistent statements proved that appellant knew the deputies entering the apartment were peace officers, which was the crux of the disputed issues at trial.

Moreover, the State did not spend any significant time advancing the "suicide by cop" theory. There was considerable circumstantial evidence contradicting appellant's testimony that he did not know the deputies were

peace officers. It was the discrepancies between appellant's testimony and the officers' testimony that the prosecutors primarily relied on in their closing arguments.[9]

For instance, Deputy Tatsch testified that the sheriff's department had been looking for appellant for over six months and had let people know that they were looking for him; several times they missed apprehending appellant by only a short period of time.[10] When the deputies went to the apartment on the morning of September 12, 2003, they were dressed in dark clothing that had sheriff's department markings on the sleeves; they were also wearing gun belts, and Sergeant White was wearing a radio on his shoulder. Three deputies testified unequivocally that they saw the blinds being parted as if by a person looking out the window.[11] The officers knocked on the door and announced their presence and purpose for at least *forty-five minutes to an hour* before

---

[9] ... For instance, the final thought the State left the jury with began as follows, "Basically, what it comes down to is, do you believe? Do you believe an officer with the Tarrant County Sheriff's Department, who is now a sergeant, or do you believe a criminal? The offense you choose depends on the version of the facts that you believe . . . ."

[10] ... Appellant admitted that Williams and another person had told him three to four months before the shooting that the fugitive squad was looking for him.

[11] ... Appellant testified that he looked out the window, but he did not see anyone outside.

entering; Cross, the maintenance technician, testified that some of the knocks were loud enough to make the patio glass door shake.[12] Deputy Pickle testified that he also knocked on the window to the right of the patio door and said, "Sheriff's department, felony warrant, go to the door."

The officers then tried to open the lock with a key from Cross (appellant failed to explain how the man with whom he and Joyce had prior altercations would have acquired a key to the apartment)[13]; when they realized the door was bolted from the inside, they used a battering ram to open it. Deputy Tatsch testified that the deputies again announced their presence and purpose after they had entered the apartment.[14] The front door of the small, one-bedroom apartment was directly across from the bedroom door with approximately thirteen to twenty feet separating the two.

---

[12] Although appellant testified that he was awakened by something that sounded like it was "brushing up" against, or bumping, the wall by the patio, he nevertheless denied hearing any of the knocking and announcing even though he was awake and made several phone calls during that time. In contrast, Cross, who was standing outside the apartment near the patio door with Deputy Pickle, testified that he heard the officers announce themselves once *inside* the apartment.

[13] Appellant had testified that he thought he was in danger from a man with whom he had had a prior altercation and that that man was the one who had broken into the apartment.

[14] Appellant also denied hearing this announcement.

Deputy Tatsch testified that before they entered the apartment, they received confirmation by cell phone that appellant was inside; he and Deputy Hernandez also testified that Williams was outside the apartment immediately after the shooting, before the Fort Worth police had even arrived.

In light of this overwhelmingly sufficient evidence at trial showing that appellant knew that there were peace officers outside his apartment—and the jury's obvious rejection of appellant's own testimony[15]—we are not convinced that the incomplete in-court limiting instruction, as modified by the correct instruction in the jury charge, affected the fairness of appellant's trial or had any significant influence upon the jury's deliberations. Therefore, considering the record in its entirety, we conclude and hold that the trial court's error was harmless. Tex. R. App. P. 44.2(b); *Lemmons*, 75 S.W.3d at 525; *Rankin*, 995 S.W.2d at 215; *see Motilla*, 78 S.W.3d at 355. We overrule the remainder of appellant's fourth point.

---

[15] Although the dissent notes that the forensics testimony supports appellant's version of events, we must likewise point out that it equally supports Deputy Tatsch's version of events. And the same evidence detailed above, coupled with the fact that appellant did not destroy drugs officers later found in plain view inside the apartment, supports the "suicide by cop" theory independently of Smith's testimony.

V. Conclusion

Having overruled all of appellant's points, we affirm the trial court's judgment.

                                                   TERRIE LIVINGSTON
                                                   JUSTICE

PANEL:  LIVINGSTON, DAUPHINOT, and MEIER, JJ.

DAUPHINOT, J., filed a dissenting opinion.

PUBLISH

DELIVERED:  October 1, 2009

36



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-07-272-CR

KOREY DEMAINE WALKER                                      APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

------------

## DISSENTING OPINION

------------

I would hold that the erroneous contemporaneous limiting instruction regarding the prior statements of witness Katrina Smith was harmful and remand this case for a new trial; I therefore dissent from the majority's conclusion that the error was harmless.

Rule 105(a) of the Texas Rules of Evidence provides that "[w]hen evidence . . . admissible for one purpose but not . . . for another purpose is admitted, the [trial] court, upon request, shall restrict the evidence to its proper

scope and instruct the jury accordingly."[1]  *Restrict* is defined as "[t]o restrain

within bounds; to limit; to confine"[2] and "to set bounds or limits to."[3]  Further,

as the Texas Court of Criminal Appeals explained in *Rankin*,

> The language of Rule 105(a) does not address the temporal
> aspect of when limiting instructions should be given, but, rather,
> sets out the circumstances under which an instruction must be
> given.  However, . . . we assume that the spirit of the rule and the
> contemplation of the rule-makers includes two separate notions:
> First, that limiting instructions actually curb the improper use of
> evidence and, second, that the rule should act in a way that not
> only "restrict[s] the evidence to its proper scope," but does so as
> effectively as possible.  Working under these notions, logic
> demands that the instruction be given at the first opportunity.  If
> limiting instructions impede the improper use of evidence, then an
> instruction given when the evidence is admitted limits that evidence
> to its proper scope immediately.  An instruction given for the first
> time during the jury charge necessarily leaves a window of time in
> which the jury can contemplate the evidence in an inappropriate
> manner.  For example, . . . if the State offered evidence to show
> that a defendant accused of child molestation had previously
> molested two other young girls, then that evidence may properly
> be considered to show intent to molest the complainant.  However,
> jurors may also improperly use that evidence to form a negative
> opinion of the defendant prior to receiving limiting instructions from
> the judge.  Jurors cannot be expected to know exactly how to use
> the evidence unless we tell them, nor can we guarantee that they
> will "remain open-minded until the presentation of all of the
> evidence and instructions . . . ."  Additionally, we cannot tell how
> jurors have used the admitted evidence. Thus, the possibility exists
> that, unless we instruct the jury on evidence concurrently with its

---

[1] Tex. R. Evid. 105(a).

[2] Black's Law Dictionary 1315 (6th ed. 1990).

[3] Webster's Third New Int'l Dictionary 1937 (2002).

admittance, jurors may, unbeknownst to us, use that evidence improperly by forming an indelible perception of the defendant that will work unfairly to his inevitable detriment.

. . . .

Limiting instructions given for the first time during the jury charge thus do not constitute an efficacious application of Rule 105(a) since it allows for the possibility that evidence will be used improperly in clear contravention to the purpose of the rule. Since limiting instructions operate most effectively when given simultaneously with the relevant evidence, it would not do to grant trial courts "discretion" to deliver those instructions, after they had been properly requested, at a less opportune time.[4]

In *Hammock*, the Texas Court of Criminal Appeals reiterated,

Passage of time and accumulation of other evidence make[s] it hard to accomplish the intended purpose (of a limited instruction) at the end of the case. If the jury is required to consider evidence in a limited manner, then it must do so from the moment the evidence is admitted. Allowing the jury to consider evidence for all purposes and then telling them to consider that same evidence for a limited purpose only is asking a jury to do the impossible. If a limited instruction is to be given, it must be when the evidence is admitted to be effective.[5]

The record shows that the trial court's contemporaneous instruction informed the jury that they could consider the prior evidence in assessing Katrina's credibility but did not communicate to them the limits or bounds of

---

[4] *Rankin v. State*, 974 S.W.2d 707, 712 (Tex. Crim. App. 1996) (citations omitted).

[5] *Hammock v. State*, 46 S.W.3d 889, 894 (Tex. Crim. App. 2001) (citations omitted).

their consideration; that is, the contemporaneous instruction did not inform the jury members of what they could *not* do—treat the evidence as substantive evidence of Appellant's guilt.

After the trial court gave the erroneous contemporaneous instruction, Katrina answered in response to the State's questions about her conversations with Appellant on the morning of the offense that she did not recall telling Detective Jamison that Appellant had indicated that the police were outside his house, that she did not remember Appellant saying that he was going to jail, that she did not recall Appellant saying that he knew he was going to jail because the police were outside, that she did not recall Appellant saying that he did not know why the police were out there, and that she did not remember calling Appellant three or four times or telling the prosecutor that she had tried to call Appellant back about four times after the telephone went dead during their conversation.  In response to the State's question, "Do you recall speaking to [Appellant] and him indicating he wished he would die?", Katrina answered, "I recall that."  She also confirmed that Appellant had told her that he was not going to see her anymore and that she had taken him seriously.

The jury demonstrated its confusion regarding the erroneous contemporaneous instruction on the same day that they received it.  At a break, one of the jurors gave the bailiff a note for the judge that said, "Judge, could

4

you please explain impeachment of a witness. We are not sure what you meant."

Like the jury, the State demonstrated its confusion concerning any limitations regarding the use of Katrina's testimony when the prosecutor argued to the court, "We submit that this was a suicide by cop and that he was not coming out and he is calling and saying his good-byes. So this goes to his mental state." Additionally, in the State's final closing argument, the prosecutor argued, "This man [Appellant] is responsible for what happened that day. He decided it was suicide by cop. That's how he was going to go out, shooting it out with the police." The State, then, used Katrina's testimony as evidence of guilt, not as evidence of her credibility or lack thereof, in arguing both to the trial court and to the jury.

Appellant's defense at trial was that he did not know that the person or persons inside his apartment were police officers until after the complainant Deputy Tatsch had already been shot. The deputies serving the warrant testified at trial. The State went to great lengths to attempt to prove to the jury that all the deputies who were part of the group serving the warrant that day wore uniforms and badges and that they identified themselves and knocked loudly for a long period of time, yelling and banging on the door for forty-five minutes to an hour, before asking the apartment complex for a key. There was

5

no suggestion in the record that anyone complained or even noticed any noise. Deputy Hernandez admitted on cross-examination that a person in an adjacent apartment was still asleep after the shooting was over and that it took awhile to wake him up.

The apartment complex's maintenance worker, Jess Cross, who arrived to give the deputies a key to the apartment, confirmed that from his vantage point—the ground below the patio side of the apartment—he heard the deputies knocking loudly on the front door, loudly enough that it shook the patio glass window, before they forced their way into the apartment by using the battering ram to break the door and also confirmed that he heard them speak. But, contrary to Sergeant White's testimony, Cross testified that they knocked only twice after he arrived.

The State also solicited testimony about where the deputies parked their marked cars in relation to the apartment. Deputy Johnson testified that he parked in front of the building that the apartment was in but that he did not believe that he had parked directly in front of the apartment. He did not remember where the other deputies had parked. Deputy Hernandez testified that the deputies had parked their cars in a secured location to the left of the building. He also testified that they all initially parked away from the building but that Deputy Pickle moved his car before the officers entered the apartment

6

to the patio side of the apartment, "right outside the window." Deputy Pickle testified that the deputies "parked, I believe it was two—just to the north, away from the apartment" and "down a ways a little bit and walked back up to the apartment" so that they could "be undetected coming up." He also testified that he moved his vehicle closer to the apartment, "right in front of" it, and ten feet away when they were trying to contact maintenance. He testified that he parked catty-cornered or at an angle and could later see "that parking lot" through the window of the apartment when he was inside the apartment. Sergeant White testified that he "parked up against the—I think there's a covered parkway opposite another patrol unit that was parked in front of [the] apartment." Detective Brian Jamison, who investigated the shooting, testified that two sheriff's department vehicles were fairly close to the front of the apartment when he arrived at the scene after the shooting.

Deputy Tatsch testified that the deputies parked "a little bit away," maybe forty yards, from the apartment for "officer safety issues"; "nobody wants to get shot trying to walk up to an apartment or tip off that we're even there." He also testified that they did not move their vehicles and did not park in front of the apartment. The maintenance worker, who was on the patio side during the shooting, testified that he saw no sheriff's department units in the

7

parking lot nearest the apartment's front door and did not testify that he saw any sheriff's department vehicles from his location.

The jury also heard evidence about blinds in the apartment. According to Deputy Tatsch's testimony, before the entry, Deputy Pickle, stationed on the patio side of the apartment, indicated that someone was looking out the blinds. Deputy Pickle testified that he saw the vertical blinds on the patio door "move like somebody had walked passed them, wind blown" and that about ten minutes later he saw someone looking at the deputies from the window to the right of the patio door; that window was the bedroom window. Deputy Pickle later clarified that he had not actually been able to make out a person looking out the windows but instead had seen movement, too high to be an animal, that suggested someone was looking out the window or as if someone were looking out the window. Unlike the patio door, the window to the right of the patio, the bedroom window, had horizontal blinds. He did not remember whether he saw movement in the blinds on the living room windows located to the left of the patio.

Sergeant White testified that he was briefed that "an individual had looked out the window several times through the blinds [and] that someone had peeked out through the blinds"; he claimed that the deputies had told him that that person was Appellant. Corporal Varnon, the crime scene technician,

8

testified that he did not dust the blinds for fingerprints, nor did he have any knowledge that anyone had dusted them for prints. The maintenance worker testified that he did not see any movement or anyone looking out the windows on the patio side of the apartment and that if the air conditioner or fan was on, the vertical blinds would move.

The jury also heard evidence about how the shooting started. The deputies' testimony indicates that after they forcibly entered the apartment, Deputy Tatsch announced again that they were deputies there to serve a felony warrant and kicked a closed bedroom door. Deputy Johnston testified that the door flew open, he saw someone crouching or kneeling near the bed in the dark bedroom, and he heard gunfire that to his knowledge did not come from his gun or the gun of Deputy Tatsch. He did not know if the door opened first or he heard the gunfire first. At almost the same time as he heard the gunfire, Deputy Johnston testified, he saw that the person in the bedroom had a gun in his hands. He did not know if he heard the gunfire first or saw the gun first. He believed that the gunfire he heard came from the bedroom and the vicinity of the gun he saw. Johnston did not know if the bedroom door stayed open or closed.

Deputy Hernandez testified that Deputy Tatsch kicked the door open, but "it came back closed somehow" and stayed closed until Appellant came out.

9

Deputy Hernandez did not see anything during the brief period that the door was opened. After the door closed, he heard gunfire and paint from the bedroom door falling off. He believed that whoever was inside the room shot first and that he and Deputies Tatsch and Johnston returned fire.

Sergeant White testified that the instant that Deputy Tatsch kicked the bedroom door, "shots rang out from inside the bedroom" and that "[y]ou could see the splinters coming out through the wall, the door."

The maintenance worker who witnessed the shooting from outside the apartment testified that the muzzle flash from the first shot came from the living room, where the officers were.

After Deputy Tatsch was shot, the deputies returned fire through the bedroom door. According to forensic evidence, seven shots went through the door itself, from the living room into the bedroom. At some point soon after Deputy Tatsch announced that he had been hit, Appellant came out of the bedroom holding a gun. Appellant surprised and shocked Deputy Johnston by heading toward the front door. Appellant moved within feet of Deputy Johnston, they saw each other, and Deputy Johnston was afraid that Appellant would shoot him. But Deputy Johnston testified that he did not see Appellant point a gun at any of the officers after leaving the bedroom.

10

Deputy Hernandez testified that after he heard Deputy Tatsch announce that he had been shot, he stepped back to the doorway of the apartment to tell Deputy Pickle. When Deputy Hernandez turned back to the apartment, Appellant was coming toward him, still carrying his gun, and Deputy Hernandez shot him. Deputy Hernandez testified that Appellant did not shoot anyone after exiting the bedroom but did point the gun, held in his right hand, at Deputy Hernandez. Deputy Hernandez also seemed to admit, however, that Appellant could have just been holding it that way naturally as he was attempting to walk or run out of the apartment. Deputy Hernandez's statement taken near the time of the incident may have provided that Appellant had held the gun in his left hand, not his right.

Sergeant White testified that Appellant came out of the bedroom firing his gun, that he pointed his gun at the deputies, and that he continued firing until he was disabled.

According to the forensic testimony, however, all three of the shell casings matching Appellant's gun were found in the same area in the bedroom, one of the bullets was in the door facing, and one went through the door facing to lodge in the couch, indicating that Appellant was standing in the bedroom when he fired all three shots.

11

Joyce Williams Walker, Appellant's wife at the time of trial and girlfriend at the time of the offense, testified that she spoke with Appellant the morning of the shooting and that he told her that someone was at the door of the apartment at which he was staying. The apartment was leased by Joyce's brother's girlfriend, Crystal. Appellant had his own house. Joyce told Appellant that she would call Crystal because it was Crystal's apartment. Instead, she spoke with her brother, who took her to the scene of the shooting.

Detective Loughman of the Fort Worth Police Department testified over defense objection that Joyce told him that Appellant had called her that morning and had told her that the police were knocking at the door, that she reported that she had told Appellant that he did not need to answer the door because the apartment was not his residence, that she told the detective that in a later phone conversation Appellant had told her that the police had just shot the lock off of the door, that she told the detective that she had advised Appellant to shoot at the police to protect himself, and that she then told the detective that she had in fact not so advised Appellant.

Joyce denied telling the police that Appellant had called her the morning of the shooting and had told her that the police were at the door and denied telling the detective that she had told Appellant that if the police came in, he should shoot them or anything to that effect.

12

Appellant testified that he did not know what time he woke up on the morning of the offense, but that he was awakened by something that sounded like it was brushing up against the outside wall of the apartment. He testified that he got up and looked out the bedroom window and that he could only recall looking out once. He did not see any police cars or sheriff's cars or any person. He testified that he did not tell Joyce that the police were at the door, that he did not know the police were at the door, that he did not know that sheriff's deputies were at the door, and that he did not recall telling her that the police had shot the lock off the door.

He admitted that he had left a phone message for Katrina asking if she had sent the police, but he stated that he left it three or four days after the shooting while he was still a patient at John Peter Smith Hospital. He admitted telling Katrina that he was not going to see her anymore but denied saying that it was because he was planning to kill himself and denied telling her that he wanted to die. Instead, he testified that he had stopped wanting to be with her because she had indicated that she was going to terminate her pregnancy.

Appellant testified that after his second conversation with Joyce that morning, he heard what sounded to him like a very loud gunshot. He thought that "somebody had shot a gun, they came in and shot a gun and they were firing in the house." He thought that the person might have been someone that

13

he and Joyce had had prior altercations with or "a number of people." He did not believe that the person or persons he heard were sheriff's deputies.

Appellant testified that after hearing what he thought was a shot, he dropped the phone, grabbed a pistol, and fired from his bedroom. He shot in the direction of his closed bedroom door; he never saw it come open. He believed that there was nowhere to run and that he had no alternative. He could see return fire coming through the walls; "[t]hey were shooting through the walls, through the walls in the door."

Appellant testified that he never heard anyone pound on the door and say sheriff's office, arrest warrant, or anything similar, and that he never knew that sheriff's deputies were outside his apartment until after the shooting. Specifically, he testified that after the shooting, it got totally quiet. He testified that he opened his bedroom door and went out, thinking that whoever had come in the apartment had gone. He testified that he was running toward the front door when he saw the two sheriff's deputies in the kitchen and that he did not point his gun at any of the deputies or try to shoot them. He further testified that he was not willing to commit a capital murder to avoid a six-year sentence.

The issue of whether Appellant knew beyond a reasonable doubt that the officers were officers before he shot was heavily litigated by both parties

14

throughout the trial. Some testimonial, physical, and forensic evidence before the jury supports Appellant's version of the events: all three casings from the bullets shot from Appellant's gun were in the bedroom, bullet holes in the bedroom door and frame showed that at least eight bullets shot into the bedroom and from the bedroom into the living room were shot through a closed door, and the maintenance man testified that the first shot was fired from the living room, not from the bedroom. The evidence to the contrary was not overwhelming.

In deciding that the erroneous contemporaneous instruction was harmless, the majority relies on, among other things, the limiting instruction in the jury charge, contending that it "would have . . . corrected" any "misconceptions the jury may have had" from the erroneous contemporaneous instruction. Yet the prosecutor's reliance on Katrina's testimony in the closing argument, *after* the prosecutor had already seen the jury charge and *after* the trial judge had already read the jury charge aloud in open court, belies the majority's contention and reaffirms the conclusion of the Texas Court of Criminal Appeals that "[a]llowing the jury to consider evidence for all purposes

and then telling them to consider that same evidence for a limited purpose only is asking a jury to do the impossible."[6]

Given the state of the evidence, Appellant's theory of the case, and the State's emphasis on the challenged testimony in furthering its "suicide by cop" theory, I believe that, in the context of the entire case against Appellant, the trial court's error in refusing to contemporaneously instruct the jury that evidence of Katrina Smith's prior statements was not admissible as substantive evidence to establish the truth of the matter asserted and that they could not consider it as evidence of Appellant's guilt had a significant or injurious effect on the jury's verdict such that Appellant's substantial rights were affected.[7]

I would therefore sustain Appellant's fourth point, not reach his remaining points, reverse the trial court's judgment, and remand this case for a new trial. Because the majority does not, I respectfully dissent.

LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: October 1, 2009

---

[6] ... *Id.*

[7] ... *See McMurrough v. State*, 995 S.W.2d 944, 948 (Tex. App.—Fort Worth 1999, no pet.).

16