02-09-394-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO.  02-09-00394-CR

 

 


 
 
 James Lawrence Smith
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

 

FROM County
Criminal Court No. 1 OF Denton COUNTY

----------

 

OPINION

----------

 

I. 
Introduction

          Appellant
James Lawrence Smith appeals his conviction for assault family violence.  He
contends in five issues that the evidence is insufficient to support his
conviction because he acted out of self-defense, that the trial court erred by
excluding evidence of the complaining witness’s alleged bias or motive, that
the trial court erred by refusing to instruct the jury on the defense of
confinement, and that the trial court erred by failing to afford him the right
of allocution.  We affirm.

II. 
Background

          Tammy
Moss, the complainant, testified that on Sunday, November 2, 2008, she attended
church with her then-husband Appellant and her children, C.M. and Z.M.[1] 
Moss testified that she drove home with her children after church and that
Appellant was waiting for them in the backyard because he did not have a key to
the house.[2]  Moss testified that she
went into the backyard and attempted to talk with Appellant.  Appellant entered
the house angrily, forcibly opening the back door and stepping on their puppy.

          Moss
testified that she followed Appellant into the house and questioned him about his
actions.  She said that Appellant started cursing and that Appellant and Z.M.
then began arguing about Appellant’s profane language.  Moss testified that she
retrieved a suitcase from the attic, took it downstairs, and put it on the bed
in the master bedroom.  She testified that as she was taking Appellant’s
clothes from the closet to put them into the suitcase, Appellant entered the
bedroom, walked toward her, pushed her into the closet, and began cursing and
calling her names.  Moss said that Appellant made a derogatory comment about
their lack of sexual intimacy and that he “picked [her] up and threw [her]
around in the closet” by grabbing her forearms.  Moss testified that Appellant
also called her another derogatory name and threw her against the towel rack in
the master bathroom.

Moss
testified that she was scared, began hyperventilating, and could not breathe;
that Appellant was shaking her; that she yelled to Z.M. for help; and that
Appellant dropped her onto the carpet when he saw Z.M.  Moss testified that Z.M.
had a knife in his hand and that Appellant choked Z.M. with one hand on his
neck and the other hand near the knife.  Moss said that she yelled at Z.M. and
Appellant to stop, that Appellant let go of Z.M., and that she left the room to
call 9-1-1.[3]

          Moss
testified that the police arrived; spoke with her, Z.M., and C.M.; and took
photographs of her injuries.  She also testified to feeling pain from being pushed,
grabbed, and shaken, and she described the bruises depicted in some of the
photographs admitted into evidence.  Moss also said that she applied for and
was granted a protective order against Appellant soon after the incident.

          On
cross-examination, Moss denied making plans to divorce Appellant or having
consulted a divorce attorney before the incident, and she testified that
although she was scared of Appellant after the incident, she was not scared of
him at the time of trial.  Moss also denied having had dinner or meeting with
Appellant forty times after the protective order was entered, but she later
admitted to meeting Appellant to—according to her—discuss issues relating to
their divorce.

          Z.M.
testified that he rode with Appellant to and from church the morning of the
incident.  He said that he and Appellant arrived home first, that they waited
in the garage for approximately ten minutes because Appellant did not have a
key, that Appellant was agitated about not having his key, and that Appellant and
Moss began arguing when Moss arrived.  Z.M. said that he and his sister went
into the kitchen and that Appellant and Moss continued arguing outside.

          Z.M.
also testified that Appellant soon entered the house as if he were “storming
off” from Moss, that Appellant opened the door forcefully, that Appellant and
Moss continued arguing in the house, and that Moss’s voice was louder than it
had been earlier.  Z.M. testified that Moss first went upstairs for a suitcase
and then to the master bedroom and that Appellant went into the garage but then
walked into the master bedroom.  Z.M. testified that he heard “a loud boom and
yelling” coming from the master bedroom and that the loud boom sounded like “a
slam against the wall.”  Z.M. also testified that Moss yelled his name, that he
believed Appellant was hurting her, and that he grabbed a knife from the
kitchen because he had never heard his mother scream like that before.

          Z.M.
testified that he went into the master bedroom, knife in hand, and saw
Appellant kneeling down over Moss in the closet area, choking Moss with his
right hand; it looked to Z.M. as if Moss could not breathe.  Z.M. testified
that he yelled at Appellant to get out of the house and raised the knife upward
as Appellant moved closer to him in anger and Moss left the room.  Z.M.
testified that Appellant pushed him in the chest with both hands, put one hand
on his throat, and used the other hand to hold the arm with the knife against
the wall.  Appellant released him when Moss returned to the room.  On
cross-examination, Z.M. acknowledged that he does not know what occurred in the
bedroom before he got there, and he testified that he had seen Moss and
Appellant argue before and that he was not alarmed until Moss called out for
him.[4]

          Sergeant
Jorge Sanchez[5] of the Frisco Police
Department testified that he received a dispatch for a domestic disturbance
involving a physical altercation between a male and female and that he and two
other officers arrived at the home to find Appellant in the garage trying to
get the officers’ attention.  Sergeant Sanchez testified that he entered the
residence to interview Moss and that she had redness on her neck and was
visually upset, crying, distraught, and shaking.  Sergeant Sanchez testified
that he interviewed each person in the home and that Appellant requested that Z.M.
be arrested for approaching him with a knife.  Sergeant Sanchez did not arrest Z.M.
because he said it was clear to him that Z.M. was responding to Appellant’s
assault on Moss; instead, Sergeant Sanchez arrested Appellant based on the
information gathered during his investigation.

          Officer
Jeremy Shirley testified to Appellant’s statements at the scene that Moss had
struck him first in the buttocks.  Officer Michael Choate testified that he
remained in the garage with Appellant and that Appellant called Moss a
derogatory name several times.

          Appellant
testified that Z.M. rode home with him from church and that he waited first in
the garage and later in the backyard for Moss to arrive.  Appellant said that
Moss approached him in the backyard wanting to talk and that he went inside
because he did not want to talk with her.  Appellant said he accidentally
stepped on the puppy when entering the house, and he denied kicking or
intentionally stepping on it.  Appellant testified that Moss became angry and
started yelling and “verbally berating” him, accusing him of kicking the
puppy.  Appellant also testified that Moss “slapped [him] in the rear end” as
he was walking into the house.

          Appellant
testified that Moss yelled at him to get out of the house and that he went to
the garage for two to three minutes to cool down and de-escalate the
situation.  He then went into the master bedroom, where he saw a suitcase on
the bed with clothes on top of it.  When Appellant picked up some of the
clothes and started taking them back to the closet, he saw that Moss was
between him and the closet.  He testified that Moss pushed him hard to prevent
him from putting the clothes away, and he stated, “I grabbed her and pushed her
over against the clothes on the side.”  Appellant said that he grabbed and
pushed Moss because she had pushed him in her attempt to keep him from putting
the clothes away.  He said that he put the clothes in the closet, that Moss
pushed him again, and that he “grabbed her by her arms.”  Appellant said that
Moss was fighting back and pushing but that he stopped holding her when she
asked him to stop.  Appellant denied hitting Moss or pulling or grabbing her
hair, and he testified that he had already released Moss before Z.M. entered
the room.[6]

          Appellant
testified that after his struggle with Z.M., he released Z.M., left the room,
and went to the garage to diffuse the situation and wait for the police.

          Appellant
testified that Moss has a temper, gets angry, and can become physical.  He
described three prior incidents where Moss was physically aggressive,
testifying that Moss had punched Z.M. in the neck in late 2006 because Z.M. had
not vacuumed properly, that Moss had struck Z.M. in November 2007 as they argued,
and that Moss became physically aggressive with his daughter M.S. in November
2007.  Appellant testified that Moss kicked him in the stomach during the
incident involving M.S. and that Moss’s children are afraid of her because of
her violence.  Finally, Appellant testified that he had been to dinner with
Moss forty times since the incident and entry of the protective order, that
they spent the night together on New Year’s Eve in 2008, and that Moss’s
reputation in the community for truth and veracity is not good.

          Michelle
Reavis testified that she had once been close friends with Moss and that she
had lived with Moss for five days.  Reavis testified that Moss’s reputation in
the community for truth and veracity is not good and that Moss is “Dr. Jekyll
and Mr. Hyde.”  Mark Moss, Moss’s ex-husband and Z.M. and C.M.’s father,
testified that he was married to Moss for seventeen years and that her
reputation in the community is for being untruthful.  Moreover, Wilberto
Cordero, John McKennie, and Laura Smith each testified that Moss’s reputation
in the community for truth and veracity is not good.

          The
State charged Appellant by information with “intentionally or knowingly or
recklessly caus[ing] bodily injury to Tammy Moss” by “grabbing or pushing or
throwing” her with his hand, and the jury found Appellant guilty of assault as
alleged in the information.[7]  The trial court sentenced
Appellant to 270 days’ confinement, probated for eighteen months.  This appeal
followed.

III. 
Sufficiency of the Evidence

          Appellant
contends in his first and second issues that the evidence is legally and
factually insufficient to support his conviction for assault because “no
rational factfinder could have found against [him] on his claim of
self-defense.”

A. 
Standard of Review

          The
court of criminal appeals has held that there is no meaningful distinction
between the legal and factual sufficiency standards.  Brooks v. State, 323
S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling Clewis v. State, 922
S.W.2d 126, 131–32 (Tex. Crim. App. 1996)).  Thus, the Jackson standard,
which is explained below, is the “only standard that a reviewing court should
apply in determining whether the evidence is sufficient to support each element
of a criminal offense that the State is required to prove beyond a reasonable
doubt.”  Id.  Therefore, we combine Appellant’s first and second issues
and apply the Jackson standard to determine whether the evidence is
sufficient to sustain Appellant’s conviction.  See id.

In our
due-process review of the sufficiency of the evidence to support a conviction,
we view all of the evidence in the light most favorable to the prosecution to
determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007).  This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton,
235 S.W.3d at 778.  The trier of fact is the sole judge of the weight and
credibility of the evidence.  See Tex. Code Crim. Proc. Ann. art. 38.04
(West 1979); Brown v. State, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008),
cert. denied, 129 S. Ct. 2075 (2009).  Thus, when performing an
evidentiary sufficiency review, we may not re-evaluate the weight and
credibility of the evidence and substitute our judgment for that of the
factfinder.  Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App.
2007).  Instead, we Adetermine whether the
necessary inferences are reasonable based upon the combined and cumulative
force of all the evidence when viewed in the light most favorable to the
verdict.@  Hooper
v. State, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson, 443 U.S. at 326, 99 S. Ct. at
2793; Clayton, 235 S.W.3d at 778.

A
defendant has the burden of producing some evidence to support a claim of
self-defense.  Zuliani v. State, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).
 After the defendant has introduced some evidence of a defense, the State bears
the burden of persuasion to disprove it.  Id.; Saxton v. State,
804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991); Dotson v. State, 146
S.W.3d 285, 291 (Tex. App.—Fort Worth 2004, pet. ref’d).  This burden does not
require the State to produce evidence disproving the defense; it requires only
that the State prove its case beyond a reasonable doubt.  Zuliani, 97
S.W.3d at 594; Saxton, 804 S.W.2d at 913; Dotson, 146 S.W.3d at
291.  To determine the legal sufficiency of the evidence to disprove
self-defense, the appellate court asks whether, after viewing all the evidence
in the light most favorable to the prosecution, any rational trier of fact
could have found the essential elements of the charged offense beyond a
reasonable doubt and also could have found against the appellant on the
self-defense issue beyond a reasonable doubt.  Saxton, 804 S.W.2d at
914; Dotson, 146 S.W.3d at 291.

B.  Applicable
Law

A
person commits assault if he “intentionally, knowingly, or recklessly causes
bodily injury to another, including the person’s spouse.”  Tex. Penal Code Ann.
§ 22.01(a)(1) (West 2011).  However, penal code section 9.31(a)(1) provides in
relevant part that “a person is justified in using force against another when and
to the degree the actor reasonably believes the force is immediately necessary
to protect the actor against the other’s use or attempted use of unlawful
force.”  Id. § 9.31(a) (West 2011).

C.  Discussion

The
evidence is legally sufficient to support Appellant’s assault conviction and
the jury’s rejection of self-defense.  Viewing the evidence in the light most
favorable to the verdict and resolving any conflicting inferences in favor of
the prosecution, the evidence reflects that Appellant was angry when Moss
arrived home from church; that he forcibly opened the back door, entered the
house, and argued with Moss; that, while still angry, he went into the bedroom
where he saw the suitcase and clothes and became angrier; that Moss was between
him and the closet when he sought to put his clothes away; and that by
Appellant’s own testimony, he “grabbed [Moss] and pushed her over against the
clothes on the side.”  Although Appellant testified that Moss hit him from
behind as he walked into the house from the backyard and later pushed him at
least twice in the bedroom as he attempted to put his clothes back into the
closet, it was for the jury to determine whether Moss’s or Appellant’s
testimony was more credible, and we are not permitted to re-evaluate the weight
and credibility of the evidence.  See Williams, 235 S.W.3d at 750.

Appellant
contends that the evidence is insufficient to support his conviction because he
only grabbed Moss to stop her from pushing and fighting with him and that he
released her when she stopped fighting with him.  Appellant further argues that
“no compelling evidence” supports Moss’s account of the incident because (1) Z.M.
and C.M. did not witness the struggle between him and Moss; (2) Z.M. and C.M.’s
testimony is not credible because they are afraid of Moss; (3) Appellant did
not flee but instead waited for the police to arrive; (4) several witnesses
testified that Moss has an unfavorable reputation in the community for truth
and veracity; (5) Moss contacted or visited Appellant numerous times after the
incident and was not afraid of him; and (6) Moss has been physically assaultive
on at least three prior occasions.  But Appellant’s arguments only point to
matters to be resolved by the jury as the finder of fact.

This
case is similar to Denman v. State, 193 S.W.3d 129 (Tex. App.—Houston
[1st Dist.] 2006, pet. ref’d).  There, a jury found Denman guilty of aggravated
assault, and Denman argued on appeal that the evidence was legally insufficient
to support the conviction.  See id. at 131, 132.  Denman
testified at trial that he had “kicked [the] complainant in the head in
self-defense after a struggle that began when she poked his foot with a knife
and pointed a loaded shot-gun at him.”  Id. at 132.  Denman also called
six witnesses who testified that the complainant had assaulted or threatened
him with weapons in the past.  Id.  The complainant did not testify at
the trial because she was in a persistent vegetative state.  Id. 
Holding that the evidence was legally sufficient to support the conviction, the
court pointed to the jury’s entitlement to “choose to believe all, some, or
none of the testimony presented by the parties” and noted that “a defendant’s
own statement regarding his intent is not enough to render the evidence,
without m0ore, insufficient.”  Id. at 132–33 (citing Sells v. State,
121 S.W.3d 748, 754 (Tex. Crim. App.), cert. denied, 540 U.S. 986 (2003)
and quoting Chambers v. State, 805 S.W.2d 459, 461 (Tex. Crim. App.
1991)).  The court also stated, “Because the jury, by finding [Denman] guilty,
implicitly rejected his self-defense theory, it necessarily chose not to
believe the testimony concerning such.”  Id. at 132 (citing Saxton,
804 S.W.2d at 914).

Similar
to the witnesses in Denman, Moss and Appellant gave conflicting testimony
about the incident, and Appellant presented testimony from several witnesses to
impeach Moss’s credibility and to show that she had been physically aggressive
in the past.  But as in Denman, we must presume that the jury resolved the
conflicts in favor of the prosecution and defer to that resolution.  See id.;
see also Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Clayton,
235 S.W.3d at 778; Williams, 235 S.W.3d at 750.  A rational trier of
fact could have found Appellant guilty of assault beyond a reasonable doubt by
choosing to believe the evidence favoring conviction and by choosing to
disbelieve the evidence favoring self-defense.  See Denman, 193 S.W.3d
at 132–33.

After
viewing all the evidence in the light most favorable to the prosecution, we hold
that a rational trier of fact could have found the essential elements of assault
beyond a reasonable doubt and also could have found against Appellant on the
self-defense issue beyond a reasonable doubt.  See Saxton, 804
S.W.2d at 914; Dotson, 146 S.W.3d at 291.  We therefore overrule
Appellant’s first and second issues.

IV. 
Exclusion of Evidence of Alleged Bias or Motive

          Appellant
contends in his third issue that the trial court abused its discretion by excluding
evidence of Moss’s alleged bias or motive.  Appellant sought to question Moss and
to give his own testimony about a checking account Moss opened and used for the
year before the assault, and he argues that this evidence revealed Moss’s bias
or motive for testifying against him because it showed that Moss had a pre-existing
plan to divorce him before she accused him of assault.  See U.S. Const.
amend. VI; Tex. R. Evid. 613(b).

A.  Applicable
Law

          We
review a trial court’s decision to exclude evidence under an abuse of
discretion standard.  Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim.
App. 2000).  A trial court does not abuse its discretion as long as the
decision to exclude the evidence is within the zone of reasonable disagreement.
 Montgomery v. State, 810 S.W.2d 372, 380 (Tex. Crim. App. 1991) (op. on
reh’g).

The
Confrontation Clause of the Sixth Amendment guarantees that “[i]n all criminal
prosecutions the accused shall enjoy the right . . . to be confronted with the
witnesses against him.”  U.S. Const. amend. VI.  The Sixth Amendment right to
confront witnesses includes the right to cross-examine them to attack their
general credibility or to show their possible bias, self-interest, or motives
in testifying.  Hammer v. State, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009)
(citing Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110
(1974)).  

The Texas
Court of Criminal Appeals has held:

[t]he possible
animus, motive, or ill will of a prosecution witness who testifies against the
defendant is never a collateral or irrelevant inquiry, and the defendant is
entitled, subject to reasonable restrictions, to show any relevant fact that
might tend to establish ill feeling, bias, motive, interest, or animus on the
part of any witness testifying against him.

Billodeau
v. State, 277 S.W.3d 34, 42–43 (Tex. Crim. App. 2009) (citing London
v. State, 739 S.W.2d 842, 846 (Tex. Crim. App. 1987)).

A
defendant is entitled to pursue all avenues of cross-examination reasonably
calculated to expose a motive, bias, or interest for the witness to testify,
and therefore, the scope of appropriate cross-examination is necessarily broad.
 Carroll v. State, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996).  But this
does not mean that a defendant can explore every possible line of inquiry.  Walker
v. State, 300 S.W.3d 836, 844 (Tex. App.—Fort Worth 2009, pet. ref’d). 
Rather, “the Confrontation Clause guarantees an opportunity for
effective cross-examination, not cross-examination that is effective in
whatever way, and to whatever extent, the defense might wish.”  Delaware v.
Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 295 (1985); see Walker,
300 S.W.3d at 844–45.  Thus, trial courts have the discretion to limit
cross-examination as inappropriate for a number of reasons, including the
prevention of harassment, prejudice, confusion of the issues, and marginally
relevant interrogation.  Carpenter v. State, 979 S.W.2d 633, 634 (Tex. Crim.
App. 1998) (citing Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct.
1431, 1435 (1986)).

Each
Confrontation Clause issue is viewed on a case-by-case basis.  Lopez v.
State, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000).  “The proponent of
evidence to show bias must show that the evidence is relevant.  The proponent
does this by demonstrating that a nexus, or logical connection, exists between
the witness’s testimony and the witness’s potential motive to testify in favor
of the other party.”  Woods v. State, 152 S.W.3d 105, 111 (Tex. Crim.
App. 2004), cert. denied, 544 U.S. 1050 (2005) (citing Carpenter,
979 S.W.2d at 634).  The trial court does not abuse its discretion by excluding
evidence of alleged bias or motive if the defendant’s offer of proof does not
establish the required nexus.  See id. at 111–12.

B.  Applicable
Facts

          Appellant
argues that the trial court abused its discretion by refusing to allow
cross-examination of Moss and testimony from Appellant concerning Moss’s plan
to divorce Appellant—as shown by evidence of the separate checking account Moss
had opened and used for the year before the incident—and that the refusal
violated his Sixth Amendment right to confrontation and his right under rule of
evidence 613(b) to expose Moss’s bias.

Outside
the jury’s presence, Moss testified that with Appellant’s agreement, she
handled the finances in their family; that she wrote the checks; that she and
Appellant had a joint checking account; that all of Appellant’s paycheck was
deposited into the joint checking account; that half of her paycheck was
deposited into the joint checking account; and that the other half of her
paycheck was deposited into her personal checking account.  Moss testified that
she had had her personal checking account with Wells Fargo since 1993 and that
all of her paycheck went into that account until she and Appellant were
married.  After they were married, Moss and Appellant opened a joint checking
account at Wells Fargo, but after Appellant’s ex-wife started working at Wells
Fargo, Appellant instructed Moss to close the account and open another one at
Chase so that his ex-wife would not know their incomes.  Moss also testified
that she closed her personal account at Wells Fargo and opened another one at
Chase at about the same time.

Moss
testified that she began depositing her paycheck into her separate account in
December 2007, but Moss testified that she did so because Appellant instructed
her to do so.  She said that Appellant’s ex-wife and the Attorney General’s
office were seeking to increase Appellant’s child support obligation, and she
said Appellant told her to open the separate account so that his ex-wife and the
Attorney General could not touch her income and could only base any child
support orders off of his income alone.  However, although Appellant could not
sign on her separate checking account, Moss testified that she paid their
bills—such as the house payment, car payment, insurance, and other community
expenses—from both the joint checking account and her separate checking
account.  Moss specifically identified payments for a motorcycle and motorcycle
insurance, the water bill, the cable bill, and the light bill that she paid
from her separate checking account.

When
questioned by the prosecution outside the presence of the jury, Moss testified
that even though it was Appellant’s contention that she had been planning to
divorce him for a year before the assault, Appellant was the one who filed for
divorce.  After Appellant’s counsel represented to the trial court that
Appellant had only learned of the separate checking account a month before
trial, the following exchange occurred:

          [Court]: 
Okay.  Just as we stand right now, does the State have any objection to the
evidence toward – about the – the checking accounts?

 

          [Prosecutor]: 
Yeah, all of it, Your Honor.  It’s not relevant to what happened on November
2nd, 2008.

 

          [Court]: 
Okay.  At this point, I’m going to sustain the objection.  We’re not going to
try the divorce proceedings here.  We’re going to stick to the facts here, and
you’re getting way far afield.  I mean, if you’ve got some good evidence that
she’s got a plan or something, bring it back to me, but you’re not even close
right now.

Appellant
did not make any argument at the time concerning the trial court’s decision to
exclude the evidence of the separate checking account, but Appellant did
revisit the issue during his case-in-chief.  At that time, and also outside the
jury’s presence, Appellant testified that Moss took his house key away in
October 2007 and that he moved in with his mother for a few weeks but moved
back in with Moss before Thanksgiving.  Appellant said that he moved back because
he wanted to be home and because Moss wanted him to come home.  When asked by
his attorney how he knew Moss wanted him to come home, Appellant testified,
“She seduced me.  She had sex with me and told me she wanted me to come home.”

          Appellant
also testified that he learned from Moss’s sister a month before trial that
Moss, from November 2007 through November 2008, “had been stealing money from
[him] and making extra house payments and extra car payments to get ahead on
her bills.”  Appellant testified that he checked his financial statements for
the previous two years and found that Moss had stopped depositing her paychecks
into the joint account on November 30, 2007, but had continued making the car
payments, the home and auto insurance payments, the electricity payments, and
other payments from the joint checking account.  Appellant testified that this
allowed Moss to financially plan ahead to divorce him because she was building a
separate account.  Appellant testified that he “wouldn’t have been very happy
about it” had he found out about Moss’s separate checking account in November
2008, that it was “a breach of trust,” and that it “could have” led to
divorce.  Finally, Appellant admitted that he had been the one to file for
divorce after his assault arrest, but when his attorney asked why he filed for divorce,
Appellant explained, “To protect the children from CPS, because CPS was trying
to take the kids away.  And if I was getting a divorce and leaving the house,
there wouldn’t be a problem.  The kids and [Moss] would be okay.”

          After
Appellant gave other testimony outside the jury’s presence concerning matters
not at issue in this appeal, the State objected on relevancy grounds to
Appellant’s testimony concerning the separate checking account, and the
following exchange occurred: 

[Appellant’s
Counsel]:  Motive is what that goes to, the motive for seducing him to come
back when he had moved out.  He was gone November of ’07, and I think that’s
one key that – that the jury needs to hear, is he had moved out of the house
November of ’07.  She seduced him into coming back.  She had a motive because
she opened a new – a different checking account and started putting her
paycheck into the new checking account.  She was in a much better position
financially, planning-wise.  She had paid ahead on some things and other
things, and I’ll get into some of that back with her when we call her back. 
But –

 

          [Court]:  I
– I’m going to sustain the State’s objection.  That’s – that’s just stretching
your pattern way too far.  I don’t see any – any evidence of a plan of – even
if there was a plan of divorce, the plan had to be towards the fact that there
was – my plan is that I’m going to get him to assault me or claim that there’s
an assault, and that’s going to be part of it.  That – that’s too far.  The
relevancy fact –

 

          [Appellant’s
Counsel]:  It – it –

 

          [Court]:  I
don’t want an argument over it.  I’m just telling you, it’s not coming in.

 

          [Appellant’s
Counsel]:  I don’t want to argue it, Your Honor, and I don’t – I don’t mean for
anything I say to be taken as an argument.  I just want to make sure that the
record’s clear, and that’s all I’m trying to do.  My purpose for introduction –

 

          [Court]: 
Uh-huh.

 

          [Appellant’s
Counsel]:  – is to show that there was a potential motive for getting him to
come back and, secondly, that there’s a pressure point, because at some point,
he’s going to discover that situation.  So there was a stress point coming up
in their marriage that she may have felt like she needed to avoid, and that
stress point would be – also be evidence to the jury if that testimony were
allowed.

 

          [Court]: 
I’m still going to sustain the State’s objection as to that.  It’s just too
far-reaching.  The dots aren’t connected.  To me, it doesn’t show any motive at
all.  There’s no clear pattern there. 

Appellant
subsequently called Moss to the stand during his case-in-chief, but he did not
ask her any further questions concerning a checking account or a plan to
divorce him.

C.  Discussion

          As
the proponent of the evidence concerning Moss’s alleged bias or motive,
Appellant had the burden to demonstrate a nexus or logical connection between
the separate checking account and Moss’s alleged plan to divorce him and her
potential motive to testify against him.  Woods, 152 S.W.3d at 111–12
(citing Carpenter, 979 S.W.2d at 634).  The trial court allowed
Appellant’s counsel considerable leeway to fully explore the evidence
concerning the separate checking account through both Moss and Appellant, but
the record does not establish the necessary nexus.  See id.

          Appellant’s
failure to establish the required nexus is illustrated by two cases in which
the appellant did establish a logical connection between the proffered evidence
and the witness’s potential motive.  See Ryan v. State, No.
04-08-00594-CR, 2009 WL 2045211 (Tex. App.—San Antonio July 15, 2009, no pet.)
(mem. op., not designated for publication); McDaniel v. State, 3 S.W.3d
176 (Tex. App.—Fort Worth 1999, pet. ref’d).  In Ryan, an assault case, the
court held that the trial court erred by limiting cross-examination of the
complainant, Ryan’s ex-wife, about custody of their oldest child.  Ryan,
2009 WL 2045211, at *3–4.  The complainant testified that when she and Ryan had
previously separated, the family court had awarded Ryan custody of their oldest
child, and Ryan established through other testimony that after he was arrested
for assaulting her, the complainant took both children, moved out of the
residence, and did not return the oldest child to Ryan.  Id. at *4.  But
the trial court did not permit Ryan to question the complainant about any
subsequent custody disputes between her and Ryan or the effect of any such
disputes on her testimony.  Id.  Recognizing that a family violence
conviction has statutory consequences in custody proceedings involving the
perpetrator’s children, the court held that “[q]uestions regarding custody
proceedings would be relevant to [the complainant]’s motivation to exaggerate
her testimony at trial.”  Id.  Ryan thus established a nexus between the
cross-examination he sought and the complainant’s potential bias because there
is a logical connection between the complainant’s desire to have custody of her
oldest child and her motivation to exaggerate her testimony against him.  See
id.

In McDaniel,
a forgery case, we held that the trial court erred by preventing McDaniel from
cross-examining the complainant, her ex-husband, about a $9,480 child support
arrearage judgment she held against him.  See 3 S.W.3d at 180–82.  We
explained that the trial court had abused its discretion by disallowing
cross-examination about the outstanding child support judgment because it had applied
the wrong relevancy test.  Id. at 181.  We stated that “relevance, in
this instance, is not measured by whether the existence of a large monetary
judgment against the complainant makes the existence of Appellant’s intent [to
forge the complainant’s signature] six years earlier more probable or less
probable, but by whether the evidence will help the jury assess the credibility
of the complainant and assess the probative value of his testimony on direct.” 
Id.  The trial court abused its discretion in McDaniel because
there was a logical connection between the child support judgment against the
complainant and his motivation to testify for the State against the woman who
held the judgment against him.  See id. at 181 & n.5.

But
the logical connection that existed in Ryan and McDaniel is, at
best, extremely attenuated in this case.  When arguing that the evidence was
admissible, Appellant’s counsel suggested that Moss first made Appellant move
out of her house in 2007, then opened the separate checking account, and later
“seduced” Appellant into moving back into the house, only to then decide to accuse
Appellant of assault because she was concerned that Appellant would discover
the checking account and divorce her.  Outside the jury’s presence, the trial
court permitted Appellant to extensively cross-examine Moss and to give his own
lengthy testimony concerning the separate checking account, but the trial court
did not see a connection between the separate checking account and Moss’s
motive or bias, stating that “[i]t’s just too far-reaching.  The dots aren’t
connected.  To me, it doesn’t show any motive at all.”  See Irby v. State,
327 S.W.3d 138, 153–54 (Tex. Crim. App. 2010), cert. denied, 131 S. Ct.
904 (2011) (noting that trial court gave Irby three different hearings outside
the jury’s presence and holding that Irby “failed to make a logical connection”
between the complainant’s testimony and his juvenile probationary status to
permit cross-examination on the probationary status to show motive for
fabrication).

“A
trial court has the discretion to limit testimony that may confuse the issues
or be only marginally relevant.”  Walker, 300 S.W.3d at 846 (citing Van
Arsdall, 475 U.S. at 679, 106 S. Ct. at 1435, and Felan v. State, 44
S.W.3d 249, 254 (Tex. App.—Fort Worth 2001, pet. ref’d)).  Whether Moss had a
separate checking account was only a marginally relevant issue and does not
necessarily indicate that she had a reason to provide false testimony.  Although
we are mindful of Appellant’s right to pursue all avenues of cross-examination
reasonably calculated to expose motive, bias, or interest in a witness to
testify, see Carroll, 916 S.W.2d at 497, 500, we agree with the trial
court’s determination that Appellant failed to show a logical connection
between the evidence of the separate checking account and Moss’s alleged bias
or motive; at a minimum, the trial court’s decision is within the zone of
reasonable disagreement.  We hold that the trial court did not abuse its
discretion by refusing to permit cross-examination of Moss and testimony from
Appellant concerning the separate checking account, and we therefore overrule
Appellant’s third issue.  See Montgomery, 810 S.W.2d at 380 (holding
that a trial court does not abuse its discretion when its decision to admit or
exclude evidence is within the zone of reasonable disagreement).

V. 
Refused Jury Instruction on Confinement

          Appellant
argues in his fourth issue that the trial court erred by refusing to instruct
the jury on the defense of confinement because the defensive issue was raised
by the evidence.  See Granger v. State, 3 S.W.3d 36, 38 (Tex. Crim. App.
1999) (reiterating the well-settled rule that a defendant is entitled to an
instruction on any defensive issue raised by the evidence without regard to the
strength or credibility of the evidence raising it).

A.  Standard
of Review

          Appellate
review of alleged jury charge error involves a two-step process.  Abdnor v.
State, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); see also Sakil v.
State, 287 S.W.3d 23, 25B26 (Tex. Crim. App. 2009). 
Initially, we must determine whether error occurred.  Abdnor, 871 S.W.2d
at 732.  If so, we must then evaluate whether sufficient harm resulted from the
error to require reversal.  Id. at 732–33.

B. 
Discussion

          Appellant
testified that Moss pushed him “hard,” that he then grabbed both of her arms,
and that he released her arms when she stopped struggling and asked him to
stop.  The trial court submitted a self-defense instruction, but Appellant
argues that his testimony also raised the defense of confinement.  The State
responds that even if confinement is a defense separate and apart from self-defense,
Appellant was not entitled to an instruction on confinement because it was not
raised by the evidence.  For purposes of our analysis, we assume without
deciding that confinement is a defensive issue or affirmative defense distinct
from self-defense.

Penal
code section 9.02 provides that “[i]t is a defense to prosecution that the
conduct in question is justified under this chapter.”  Tex. Penal Code Ann. §
9.02 (West 2011).  Penal code section 9.31 permits the use of force “when and
to the degree the actor reasonably believes the force is immediately necessary
to protect the actor against the other’s use or attempted use of unlawful force.” 
Id. § 9.31(a).  And as relevant here, section 9.03 states that
“[c]onfinement is justified when force is justified by this chapter if the
actor takes reasonable measures to terminate the confinement as soon as he
knows he safely can.”  Id. § 9.03 (West 2011).  However, “confinement”
is not defined in the penal code.

When
construing a statute, reviewing courts seek to effectuate the legislature’s
intent in enacting it.  Boykin v. State, 818 S.W.2d 782, 785 (Tex. Crim.
App. 1991); Adams v. State, 270 S.W.3d 657, 660 (Tex. App.—Fort Worth
2008, pet. ref’d).  The plain meaning of the words should be applied unless the
language is ambiguous or application of the statute’s plain language would lead
to an absurd result that the legislature could not have intended.  Boykin,
818 S.W.2d at 785; Adams, 270 S.W.3d at 660.

Only
two Texas cases have addressed section 9.03, and neither addresses the present
issue of whether momentarily grabbing and holding another person during a
struggle constitutes confinement under section 9.03.  See generally Adelman
v. State, 828 S.W.2d 418, 422–23 (Tex. Crim. App. 1992); Kenny v. State,
292 S.W.3d 89, 93 (Tex. App.—Houston [14th Dist.] 2002, pet. ref’d).  In Adelman,
the court of criminal appeals held that legally sufficient evidence supported
Adelman’s false imprisonment conviction and the jury’s rejection of her
confinement defense because she bound her mentally-ill son with handcuffs and a
foot shackle but did not take reasonable measures to terminate the confinement
as soon as she safely could.  See 828 S.W.2d at 422–23.  In Kenny,
Kenny testified that he bound the complainant’s wrists with rope to prevent her
from driving while intoxicated, but the court held that Kenny was not entitled
to defensive instructions on confinement, protection of life or health, or
necessity because there was no evidence of immediate necessity or imminent harm. 
See 292 S.W.3d at 101; see Tex. Penal Code Ann. § 9.03; id.
§§ 9.22, .34 (West 2011).

Citing
Kenny, Appellant argues that because the trial court in this case instructed
the jury on the law of self-defense, a separate instruction on confinement
“logically followed.”  See 292 S.W.3d at 101–02.  The court stated that
“because [Kenny] concedes that an instruction regarding confinement as
justifiable force under section 9.03 would only be appropriate if an
instruction under section 9.34 were, we conclude that, by extension, the trial
court properly refused to instruct the jury on confinement as justifiable force
under section 9.03.”  Id.  However, the court had previously held that
Kenny’s acts were not justified because there was no imminent harm, and the confinement
involved binding the complainant’s wrists together with a rope to prevent her
from driving while intoxicated.  Id. at 93.  Kenny is unhelpful
here because it did not address the conduct necessary to constitute confinement
under section 9.03.[8]  See id. at
100–02.

Because
there are no relevant case law interpretations of section 9.03, we turn to
dictionary definitions of “confinement” to determine whether briefly grabbing
and holding a person during a struggle constitutes confinement under section 9.03. 
See Ramos v. State, 303 S.W.3d 302, 306 (Tex. Crim. App. 2010) (stating
that courts may consult standard dictionaries “[w]hen attempting to discern
[the] fair, objective meaning” of an undefined term); see also Tex.
Penal Code Ann. § 1.05(a) (West 2011) (providing that courts are to construe
penal code provisions “according to the fair import of their terms, to promote
justice and effect the objectives of the code”).  In that regard, various
dictionary definitions suggest that “confinement” requires something more than briefly
grabbing and holding another person’s arms during a struggle.  First, Black’s
Law Dictionary defines “confinement” to mean “the act of imprisoning or
restraining someone,” but it gives “solitary confinement” as an example of confinement. 
Black’s Law Dictionary 340 (9th ed. 2009).  Thus, although the definition
includes restraining someone, the extent of restraint necessary to constitute
confinement is unexplained, and the example of solitary confinement implies
that the common legal definition of confinement does not include merely
grabbing and holding another person during a struggle.  Indeed, the Court of Criminal
Appeals has noted that “imprisonment” is confinement’s “first meaning in the
law” and that “confinement” means the “state of being confined; shut in; or
imprisoned.”  Lebo v. State, 90 S.W.3d 324, 327 & n.7 (Tex. Crim.
App. 2002) (quoting Black’s Law Dictionary 270 (5th ed. 1979)).[9]

Further,
non-legal dictionaries also define “confinement” as something more than grabbing
and holding a person during a struggle.  For example, Webster’s Third New
International Dictionary defines “confine” as “to hold within bounds,”
“restrain from exceeding boundaries,” “to keep in narrow quarters,” or
“imprison,” and the Oxford English Dictionary defines “confine” to mean “to
shut up, imprison, immure, put or keep in detention, to relegate to certain
limits.”  Webster’s Third New International Dictionary 476 (2002); Oxford
English Dictionary 805–06 (24th ed. 1983).  Again, each of these sources define
“confine” or “confinement” as something more than momentarily grabbing and
holding another person during a struggle.

Moreover,
other justification statutes support an interpretation of confinement as more
than merely grabbing and holding another person during a struggle.  See
Ramos v. State, 264 S.W.3d 743, 750 (Tex. App.—Houston [1st Dist.] 2008), aff’d,
303 S.W.3d 302 (Tex. Crim. App. 2010) (stating that the undefined term “should
not be read in a vacuum, but rather it should be read within the context of the
statute in which it appears”).  Penal code section 9.31 permits the use of
force when the actor “reasonably believes the force is immediately necessary”
to protect him against another’s use or attempted use of force, and section
9.03 in turn provides that confinement is justified when force is justified.  See
Tex. Penal Code Ann. §§ 9.03, .31.  But there is no discernable distinction
between the force Appellant allegedly used to grab and hold Moss in
self-defense during the struggle and the force he allegedly used to grab and
hold Moss during the struggle to “confine” her.  In other words, while there
are undoubtedly factual scenarios in which a person could both act to confine
an aggressor to prevent an attack and also use force in self-defense,
Appellant’s testimony is not evidence that he confined Moss within the meaning
of penal code section 9.03.  If the legislature intended confinement under
section 9.03 to include merely restraining a person by briefly grabbing and
holding the person during a struggle, it could have included both confinement
and restraint within section 9.03 or defined confinement to include restraint,
but it did not do so.  See generally Tex. Penal Code Ann. § 20.01(1) (West
2011) (defining “restrain” for purposes of kidnapping and unlawful restraint
offenses to mean “to restrict a person’s movements without consent, so
as to interfere substantially with the person’s liberty, by moving the person
from one place to another or by confining the person” (emphasis added)).

The
disposition of this case does not require that we assign a definite meaning to
“confinement” within the context of penal code section 9.03.  However, we hold
that “confinement” as contemplated by the legislature in section 9.03 was not
satisfied in this case.  Accepting Appellant’s testimony as true, Appellant’s
act of grabbing and holding Moss during their physical altercation was the use
of force contemplated by penal code section 9.31 (self-defense)—not confinement
contemplated by penal code section 9.03 (confinement), and the jury in this
case was given an instruction that required acquittal if it found that
Appellant “grabbed or pushed or threw” Moss in self-defense.  There was no
evidence that entitled Appellant to a separate defensive instruction on
confinement, and the trial court did not err by refusing to submit the separate
instruction.  We overrule Appellant’s fourth issue.

VI.  Allocution

          Appellant
argues in his fifth issue that the trial court erred by failing to afford him
the right of allocution pursuant to code of criminal procedure article 42.07.  See
Tex. Code Crim. Proc. Ann. art. 42.07 (West 2006).  However, Appellant was
required to object to the trial court that he was denied his right to
allocution under article 42.07 in order to preserve that complaint for
appellate review.  Eisen v. State, 40 S.W.3d 628, 636–37 (Tex. App.—Waco
2001, pet. ref’d); see also Aguilar v. State, No. 13-09-00613-CR, 2010
WL 2432095, at *1 (Tex. App.—Corpus Christi June 17, 2010, no pet.) (mem. op.,
not designated for publication); Matthews v. State, No. 05-08-01250-CR,
2009 WL 824769, at *6 (Tex. App.—Dallas Mar. 31, 2009, pet. ref’d) (mem. op.,
not designated for publication).  Because Appellant did not voice any objection
to the trial court’s alleged failure to permit him allocution pursuant to
article 42.07, Appellant failed to preserve his fifth issue for appellate
review, and we overrule it.  See Tex. R. App. P. 33.1(a); Eisen,
40 S.W.3d at 636–37; Matthews, 2009 WL 824769, at *6.

VII. 
Conclusion

          Having
overruled each of Appellant’s five issues, we affirm the trial court’s
judgment.

 

ANNE GARDNER
JUSTICE

 

PANEL: 
GARDNER,
WALKER, and GABRIEL, JJ.

 

PUBLISH

 

DELIVERED:
 June 16, 2011









[1]At the time of the August
2009 trial, Z.M. was sixteen years old, and C.M. was fifteen years old. 
Appellant is not their father.





[2]Moss testified that she had
taken Appellant’s house key and asked him to move out approximately three weeks
earlier.





[3]The recording of the 9-1-1
call was admitted into evidence and played for the jury.





[4]C.M. also testified about
the events leading up to and including the physical altercation between Moss
and Appellant and between Z.M. and Appellant.  C.M.’s testimony is largely
cumulative of and consistent with that by Moss and Z.M.





[5]Sergeant Sanchez was a
corporal at the time of the incident.





[6]Appellant admitted on
cross-examination, however, that he was angry when he went to the garage to
cool down, that seeing the clothes and the suitcase in the bedroom made him
angry, and that he was still angry when he went into the closet with his
clothes.  Appellant also admitted to making derogatory remarks about Moss to
the police and telling the police that he had pushed Moss.





[7]The State also charged
Appellant by information with assaulting Z.M., but the jury found Appellant not
guilty in that case.





[8]Adelman is
similarly unhelpful because it turned not on whether Adelman confined her son
but on whether she ended the confinement as soon as it was safe for her to do
so.  See 828 S.W.2d at 422–23.





[9]Lebo is both
factually and legally distinguishable from this case.  It addressed whether a
person is entitled to release on bond pending appeal after a jury assesses a
term of imprisonment but recommends community supervision and the trial court
follows the jury’s recommendation.  See id. at 325–26.  We note it here
merely as context for the commonly understood meaning of confinement.