

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00273-CR
No. 02-24-00274-CR
No. 02-24-00275-CR

_____

THOMAS BOYKIN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court Nos. 1781682, 1780709, 1780711

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

## I. Introduction

On the evening of May 16, 2023, nine days before he was eligible to retire from his job teaching middle-school science, Appellant Thomas Bennett Boykin argued with his wife and then assaulted her, shot his 13-year-old son three times, and shot his 21-year-old stepdaughter twice,[1] resulting in three family-violence-related charges—two first-degree offenses of aggravated assault causing serious bodily injury with a deadly weapon and one second-degree offense of aggravated assault causing bodily injury while exhibiting a deadly weapon. *See generally* Tex. Penal Code Ann. § 22.02 (aggravated assault).

Boykin pleaded guilty to the charges,[2] opted to have a jury assess his punishment, and asked the jury to recommend a probated sentence in an attempt to avoid prison. At the punishment trial's conclusion, Boykin did not object to the jury charge, which contained a repealed good-conduct-time instruction. *See* Act of May 26, 2015, 84th Leg., R.S., ch. 770, §§ 2.08, 4.02, 2015 Tex. Gen. Laws 2321, 2367–68, 2395 (amended 2019) (current version at Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a)).

---

[1]We will not refer to the victims by name to protect the minor child's identity. *See* Tex. R. App. P. 9.8 cmt. (stating that Rule 9.8 does not limit an appellate court's "authority to disguise parties' identities in appropriate circumstances"), 9.10(a)(3) (defining as "sensitive data" in a criminal case "the name of any person who was a minor at the time the offense was committed").

[2]Boykin also pleaded "true" to the family-violence allegations.

After deliberating for just over two hours, the jury sentenced Boykin to the maximum possible incarceration—confinement for life for the first-degree offenses and 20 years' confinement for the second-degree offense—and the trial court set the sentences to run concurrently and made affirmative family-violence and deadly-weapon findings. *See* Tex. Penal Code Ann. § 12.32 (stating first-degree felony punishment range of confinement for life or 5–99 years and up to a $10,000 fine), § 12.33 (stating second-degree felony punishment range of 2–20 years' confinement and up to a $10,000 fine).

In a single issue, Boykin complains that he was egregiously harmed by the unpreserved charge error because the evidence showed that he was a loving husband, father, and teacher but the jury imposed the maximum sentence in all three cases. The State concedes the error[3] but asserts that it was not egregiously harmful. Because the record reflects that the unpreserved error was harmless, we affirm the trial court's judgments.

## II. Discussion

Boykin did not object to the outdated instruction, but we must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). But unpreserved charge error warrants

---

[3]We are not bound by the State's concession. *See Oliva v. State*, 548 S.W.3d 518, 520 (Tex. Crim. App. 2018).

reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19; *see also Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006) (stating that *Almanza* is the proper standard of review for unobjected-to charge error instructing jury about parole eligibility).

The appropriate inquiry for egregious harm is fact- and case-specific, and we must consider the actual degree of harm in light of the entire jury charge, the state of the evidence—including the contested issues and weight of probative evidence—the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Garcia v. State*, 710 S.W.3d 361, 365 (Tex. App.—Fort Worth 2025, pet. ref'd) (citing *Gelinas v. State*, 398 S.W.3d 703, 708–10 (Tex. Crim. App. 2013), and *Almanza*, 686 S.W.2d at 171). Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive. *Id.* at 365–66 (citing *Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011)). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Id.* at 366 (citing *Almanza*, 686 S.W.2d at 174).[4]

---

[4]The parties disagree on who has the burden to show egregious harm. The State asserts that Boykin has the burden. Boykin states that neither party has the burden to prove harm. Boykin is correct: Neither the State nor the defendant has the burden to prove harm from charge error; rather, we must assess harm from the error's context. *Ovalle v. State*, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000); *see also Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022) ("Neither party bears the burden to show

4

In *Garcia*, we recognized that—although the inquiry is fact- and case-specific—a defendant generally does not suffer egregious harm from the unpreserved erroneous inclusion of a good-conduct-time instruction when (1) the charge also contains the standard curative language stating that the jury cannot consider the extent to which the good-conduct time could be awarded to or forfeited by the defendant[5]; (2) the punishment-phase evidence makes it unlikely that the good-conduct-time reference caused any harm in light of the defendant's prior convictions or other bad acts; and (3) neither party mentions good-conduct time during closing arguments. *Id.* at 364–65.

## A. Voir dire

Here, neither the trial court nor the parties mentioned good-conduct time during voir dire. Instead, they discussed the punishment range, the possibility of probation instead of prison time, and mental health as a mitigating issue.

Regarding probation, some potential jurors said that—without knowing more—they could not give probation after hearing that someone had pleaded guilty to a first-degree felony involving a shooting causing serious bodily injury to a family member.

harm."); *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) ("On appeal, neither party bears the burden of showing harm or a lack thereof under this standard."); *Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008) ("[W]e affirm that burdens of proof or persuasion have no place in a harm analysis conducted under *Almanza*.").

[5]The jury is presumed, unless the record shows otherwise, to have complied with a trial court's instructions. *Walker v. State*, 300 S.W.3d 836, 850 (Tex. App.—Fort Worth 2009, pet. ref'd).

One stated, "[O]nce the bullets start flying . . . it would be hard for me to even think of considering it." Only four potential jurors (who were not selected) could not consider a life sentence.

During the defense's voir dire, the panel was asked to indicate whether they strongly agreed, agreed, disagreed, or strongly disagreed with the statement, "Mental health problems are too often used as an excuse when people don't want to accept responsibility for their actions." Eight of the potential jurors who were selected to sit on the jury agreed with the statement, while of the remaining four who were selected to sit on the jury, three strongly agreed, and only one disagreed. Defense counsel also asked the panel if they had ever personally struggled with mental health, meaning anxiety, depression, or bipolar disorder. One of the potential jurors, who was selected to sit on the jury, recounted a time when she had suffered depression and went to counseling; she stated, "[The] first step is stepping up and saying, 'I need help.'" Defense counsel also asked if anyone had already foreclosed the possibility of probation, and the potential jurors who said that they had were excused, as were two who indicated their bias because of mental health issues in their families.

## B. Opening statements

Neither party mentioned good-conduct time during the opening statements. Instead, the prosecutor explained that the evidence would show violence caused by rampant jealousy and the warning signs beforehand and discounted Boykin's anxiety as an "excuse for taking a gun and shooting [his] children, trying to hurt [his] wife."

6

Defense counsel argued that Boykin had mental health issues and did not deserve a life in prison because he had been a law-abiding productive citizen who had "spent his entire professional career teaching . . . the kids in our community" and was nine days away from retirement before that night. Defense counsel also reminded the jury that it had sworn to give fair and impartial consideration to the full range of punishment.

## C. The state of the evidence

The evidence showed that Boykin had a jealousy problem as to his wife[6] that extended beyond his obsessive and unfounded concerns about her attractive new boss to her relationships with their church friends, her other coworkers, her medical providers, her daughter, and even the family cat. Boykin's best friend testified that months before the shooting, Boykin had confided to him that "he had his guns ready, and he wanted to shoot both of the kids . . . to get [at his wife]."[7]

Boykin's son was 15 years old at trial and testified about waking up after Boykin shot him, stating,

> And I woke up and I was shot two times in the shoulder and the chest.
> And I rolled over on like my hands and knees and had some big like gasps.

---

[6]After the events of that night, Boykin's wife filed for divorce and obtained a lifetime protective order against him.

[7]Boykin's friend testified that he had not reported the statement to anyone because Boykin had promised him that he would talk to his counselor, assured him that "this would never happen," and begged him not to tell Boykin's wife because she would leave him. His friend lamented that he would feel guilty for the rest of his life because he had done nothing—believing that Boykin was incapable of shooting the children—and the children had been hurt.

And one of the bullets fell out of me. And then I looked over, and [Boykin] was grabbing on my mom's hair, like not letting her leave, and she was trying to, you know, get away from him.

So [I] ran at him and he shot me again, but my mom got out and got -- I don't know, but she got out the hallway. And then he followed her. So, you know, I checked up on my sister, made sure she was at least alive, and she was. So I went in there -- my mom was already out, but I went in there to go talk to him, and I asked him like, you know, "Can I leave? I'm only 13. I'm too young. I don't want to die. Please let me leave."

Boykin told him, "No, go back to your room." He obeyed and texted his girlfriend that he loved her before he called 911. The jury listened to his 911 call. When the police arrived, Boykin told his son, "If you want to live, get out," and he stumbled out of the house, where his mother and the police were waiting.

Boykin had raised his wife's daughter since she was three years old. She was home from college for the summer and had been getting ready for bed when she saw Boykin hit his wife. She saw Boykin point the gun at her sleeping brother and was trying to flee into her bedroom closet when he shot her twice in her lower back. When Boykin told the children to get out if they wanted to live, she had been unable to move and feared that he would come back and finish her off because she could not get out of the house. The jury listened to her ten-minute 911 call, which she made from her bedroom floor; Boykin's voice could be heard in the call's background, stating, "All I wanted was a hug . . . . that was all I asked for." She testified that when Boykin said that "[a]ll [he] wanted was a hug," it took "everything in [her] not to say anything because [she] didn't want him to come back and shoot [her] again." The 911 recording

8

also picked up some of Boykin's statement about going outside. Just over seven minutes into the 911 call, Mansfield Police announced their presence in the home.

Because of the active-shooter nature of the 911 calls that night, emergency medical technicians were not allowed on the scene until Boykin surrendered. The jury viewed body-camera footage of the children's wounds and the police officers' attempts to stop the bleeding before emergency medical technicians were allowed on-site. In one of the videos, Boykin's son, who was bleeding from his wounds as his worried mother looked on, asked, "Why would he do this?" and "Why would he shoot me? I thought he loved me." He also asked his responding officer if she thought he would survive; the responding officer was later diagnosed with post-traumatic stress disorder from the events of that night.

The first officer to locate Boykin in the house wore a body camera, and his footage showed Boykin, with a calm and emotionless demeanor, tell the officer, "It was all me." Boykin also told the officer that two guns lay on the bathroom counter but that he had only used one.

Boykin had shot his son in the chest (the bullet also went through his arm), in the buttocks, and through the intestines, requiring placement of a colostomy bag, and photos of the injuries after surgery were shown to the jury. His son testified that he had loved his father before the shooting, but after the shooting, he feared Boykin and could not imagine ever missing him.

Boykin's stepdaughter had a fractured pelvis, and surgeons had to repair her uterus and bladder. To get to her uterus, they had to "cut [her] completely open." She was on a walker and a cane for months because of her injuries. Photos of her injuries were shown to the jury. Neither she nor her brother could handle any sudden movements or loud sounds, and she testified that she felt betrayed by Boykin because she had loved him and now was afraid of him. His wife testified that she was afraid of Boykin, both for herself and the children, and was afraid that if he were ever released from prison, he would "come after [her] and the children to finish what he started." She also testified that she believed Boykin had shot the children instead of her to cause her more pain and that she would rather die than remain alive if they were dead.

Many of Boykin's friends testified that Boykin, "a good solid Christian," had suffered from anxiety, tended to frame himself as a victim, and could be obsessive about things like his hobbies—fishing and hunting—and other men around his wife, and the witnesses who had known him personally stated that they never could have imagined his shooting his children. During cross-examination, his wife admitted that before the shooting, Boykin could be a great guy—generous and kind-hearted—and that she had never doubted that he loved her or their son, to whom he had been a good father. Boykin had no prior criminal history; however, both his wife and his ex-wife testified about unreported incidences of domestic abuse.

During the defense case, one of Boykin's friends opined that Boykin should receive an appropriate—not "extreme"—sentence in light of his 30 years' experience

with him as a good friend, kind person, and good family man, and another testified that he had no fear that Boykin would "go and do something like that again."  Boykin's cousin told the jury that this one incident should not define who Boykin was as a human being and that while Boykin's children considered him a danger now, he did not consider Boykin to be a danger to society.  Boykin's brother testified about their "very emotionally abusive" father and Boykin's college girlfriend who had cheated on him and had left him emotionally stunted.

After the prosecutor showed photographs of the children's wounds to one of Boykin's friends, who had recommended mandatory therapy and mental health treatment for Boykin, the following colloquy ensued:

> Q. What do you see?
>
> A. I see some horrific things, gunshot wounds, blood everywhere, severe scarring.
>
> Q. If a random man had done that to your children, almost killed them, inches away from death, you would tell me that you would stand up there and ask for him to be on probation?
>
> A. If I was on the jury, and if I was given all the testimony and knew everything, I could answer that question.
>
> Q. I'm asking you if a man tried to kill your children, doesn't matter who he was before, he tried to kill your children, would you want him to be on probation?
>
> A. A random man came into my house and tried to kill my children?
>
> Q. Sure.
>
> A. I would try to kill him myself.

11

Q. Exactly.

A. However, it wasn't a random man. It was their father that obviously had a horrible mental incident and snapped.

Q. Doesn't it make it worse that it's their father that tried to kill them?

A. (No audible response.)

Q. Because you're a father, and you're supposed to protect your children, right?

A. Yes, sir.

Q. When you try to murder them, that's not being a good father, is it?

A. Sir, if he tried to murder them, they'd be dead.

## D. Jury charge

The jury charge contained the standard instructions regarding extraneous offenses, the defendant's right to remain silent, and unanimity. Because Boykin sought a probated sentence, his charge also contained an instruction informing the jury how it could recommend community supervision and suspension of Boykin's sentence.

The jury charge also contained the following instruction setting out the erroneous mention of good-conduct time, shown below in italics:

> In determining the punishment in this case, you are instructed that you are not to discuss among yourselves how long the defendant will be required to serve any sentence of confinement you decide to impose. *Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and the Governor of the State of Texas.*

*Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.*

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in the case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, *without consideration of any good conduct time he may earn.* If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law *and good conduct time* might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law *and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant.* You are not to consider the manner in which the parole law may be applied to this particular defendant. [Emphases added.]

## E. Closing arguments and deliberations

### 1. The parties' closing arguments and the State's rebuttal

The prosecutor told the jury that they could not take into consideration when they thought Boykin might get parole because "[n]o one in this room makes that decision" and argued that probation was "absolutely not appropriate in this case." She characterized Boykin as a coward and a monster for, among other things, having abused

13

his second wife and having shot his stepdaughter and his sleeping 13-year-old son before turning to his reason for shooting the children: a relationship he had created in his mind between his wife and her boss, neither of whom he shot. The prosecutor recommended life in prison.

Defense counsel argued that this was not a normal criminal case and that Boykin needed psychotherapy. He disagreed with the "monster" characterization, asserting that Boykin had just hit his "snapping point," and encouraging the jury to consider "the whole man," whose plea of guilty "should count for something" and who should be treated differently from lifelong criminals in light of the positive testimony about him.

In rebuttal, the prosecutor argued that Boykin should not receive credit for pleading guilty because his guilt would not have been difficult to prove and that not every witness testified that he was a wonderful person before the shooting. "[T]he Defense wants you to believe that this was one bad year, that led to one bad day, that led to 30 bad seconds in this man's life," but the offenses to which he pleaded guilty were intentionally and knowingly shooting his children and beating his wife. The prosecutor stated, "This isn't about anxiety. This is a narcissist, a controlling abusive man" who was the "victim" in every situation and around whom the world revolved. "He goes to jail today for the rest of his life so that these people can have peace."

## 2. Deliberations and verdict

The jury deliberated for two hours and five minutes, from 11 a.m. to 1:05 p.m. In its first note, the jury asked to see Boykin's journals from 2021, 2022, and 2023. The

trial court responded that those items were not in evidence.[8]  In its second note, the jury asked about sentencing, stating, "Sentence imposition -- do we, the jurors, decide concurrent and/or consecutive when applying sentence to [each child] separately?"  The trial court responded that the jury would not decide this.

The jury did not recommend community supervision, and it sentenced Boykin to maximum confinement in each case.

**F.  Analysis**

Both parties agree that the closing arguments and deliberations do not favor a finding of egregious harm when neither party mentioned good-conduct time and the jury sent out no notes about it.  Boykin nonetheless argues that the remaining factors weigh in favor of his having suffered egregious harm, referring to his maximum sentences.[9]

---

[8]Boykin's wife testified that when they moved out of the house because they were afraid to continue living there, she discovered that Boykin had kept journals documenting everything that had happened in their lives between 2010 and 2023.  The journals were not admitted into evidence for their contents but were shown as a demonstrative exhibit.

[9]Boykin cites us to *Shamburger v. State*, No. 05-20-00108-CR, 2021 WL 2430903, at *8 (Tex. App.—Dallas June 15, 2021, no pet.) (mem. op., not designated for publication).  In *Shamburger*, our sister court remanded for a new punishment trial when the charge included the erroneous good-conduct time instruction.  *Id.* at *1. The defendant, one of a group of three assailants, was convicted of aggravated robbery with a deadly weapon and sentenced to 65 years' confinement.  *Id.*  The court rested its decision on the prosecutor's telling the jury about parole eligibility during voir dire and the jury's notes during deliberations that asked about the defendant's payment of fines

### 1. State of the evidence

Boykin argues that the state of the evidence—that he had no prior convictions and was universally well-thought-of—made the erroneous instruction harmful when he received the maximum sentences but that it should weigh neutrally in the harm analysis. He refers us to evidence that he "gave the world a life-long career of passionate, love-filled teaching"; that he "earned a reputation within his church group for helping others who had been going through rough times"; and that he had been "a positive source of

---

"during his parole." *Id.* at *8. The court inferred that the jury was focused on how parole "and, by extension, good conduct time might impact" the defendant. *Id.*

The Dallas court later distinguished *Shamburger*. *See Dixon v. State*, No. 05-21-00847-CR, 2023 WL 4042600, at *10 (Tex. App.—Dallas June 16, 2023, pet. ref'd) (mem. op., not designated for publication). In *Dixon*, the jury convicted the defendant, who suffered from schizophrenia, of murdering his stepmother while she slept—shooting her twice. *Id.* at *1. He also shot his father, who had also been sleeping but who survived, and he confessed to police that he had planned to kill them for two years. *Id.* His charge contained the outdated instruction, and the jury assessed his punishment at life confinement. *Id.* at *2, *7. The Dallas court affirmed the conviction when no evidence regarding possible parole or good-conduct time was offered during either phase of the trial and neither was mentioned during voir dire or discussed in argument. *Id.* at *9–10 ("[O]ther than the erroneous language in the charge, there was no mention of parole or good conduct time by anyone at any time."). The charge contained both the outdated instruction and the curative instruction. *Id.* at *8. The jury sent out a note to ask whether "the assignment of life in prison mean[t] the defendant [was] not eligible for parole," the trial court asked them to continue deliberations, and the jury returned the punishment verdict an hour later. *Id.* at *9. Unlike in *Shamburger*, there was no focus or emphasis on parole's impact. *Id.* at *10. After weighing all of the harm factors—particularly the state of the evidence, which supported the life sentence, *id.* at *8—the court concluded that the record did not support a finding of egregious harm. *Id.* at *10.

We are not bound by the *Shamburger* holding, and the facts of the case before us are more like those of *Dixon* than of *Shamburger*.

16

inspiration for others, despite growing up in a household with a 'very emotionally abusive father' and despite battling debilitating anxiety throughout his life." Although his ex-wife and current wife both testified that he had anger-related issues and had committed acts of violence against them, his friends "never saw him be violent," and many witnesses testified that he "had been a good husband and father with a heart full of generosity." He points to some evidence that medication mismanagement led to the offenses, for which he "accepted accountability . . . by pleading guilty in the jury's presence." Boykin contends that the overall state of the evidence at trial "showed a man without any criminal history who battled with mental[]health issues, and, unfortunately, lost the battle in a singular moment out of the entirety of his life."

The State responds that the evidence heavily favors a finding of no egregious harm and identifies the following as support for Boykin's maximum sentences regardless of the erroneous instruction, arguing that "[n]o amount of mitigating evidence could neutralize the evidence of the exceptionally heinous crimes [he] inflicted on his family":

- Boykin's ex-wife described him as a "mean man" filled with rage who she still fears; testified about two instances when he physically abused her, once while she was pregnant; and testified about the day she came home to find that he had abandoned her and their two young children—a three-year-old and a seven-month-old.

- Boykin's current wife described the night that he beat her, shot his sleeping son, and shot his stepdaughter.

- Boykin told his best friend before the shooting that he was ready to shoot the children in order to hurt his wife.

17

- The State presented graphic photographs and body camera footage of the children's bullet wounds, the bloody crime scene, and Boykin's wife's injuries.

We agree with the State that the state of the evidence heavily weighs against egregious harm.

## 2. Jury charge

The State argues as follows regarding the jury charge:

- That the charge as a whole weighs against an egregious-harm finding, pointing out that it included the standard curative language admonishing the jury that it could not consider the extent to which good-conduct time could be awarded to or forfeited by the defendant;

- That the court should presume—consistent with precedent from this court and from the Court of Criminal Appeals—that the jury complied with the trial court's instructions by not considering inapplicable good-conduct time; and

- That Boykin's sentences were within the statutory range and do not show egregious harm considering the charged offenses' circumstances and were justified when "the jury could have viewed [his] crimes as particularly heinous because the victims were his child—whom he shot as the child slept—and stepchild—whom he shot as she begged for mercy" and when nothing indicates that the jury considered good-conduct time when making its sentencing decision.

Boykin contends that the jury's assessing the maximum sentences on all three offenses weighs in his favor. He also argues that under *Arnold v. State*, 786 S.W.2d 295, 300 (Tex. Crim. App. 1990), the curative language was of no consequence when the jury had already been told in the same instruction that it *could* consider the stated explanation of good-conduct time. But in *Arnold*, in which the Court of Criminal Appeals considered the effect of the parole instruction, while the court stated that a curative instruction is of "no *constitutional* consequence," it did *not* hold that a curative

instruction was irrelevant to a harm analysis. *Id.* (emphasis added). To the contrary, the court stated that the fact that a "curative" instruction was given is "a proper factor in a harm analysis unless the record suggests that the jury did indeed consider the parole law in assessing punishment." *Id.* at 315.[10]

Further, as argued by the State, we assume that the jury followed the instructions as given. *Luquis*, 72 S.W.3d at 366. In *Luquis*, the Court of Criminal Appeals addressed a challenge to the good-conduct-time instruction after the defendant was convicted of murdering a fellow prison inmate by repeatedly stabbing him; the defendant described the murder in his written confession, and during punishment, the State offered evidence of his four prior burglary-of-a-habitation convictions, for which he had been sentenced to 30 years' confinement. *Id.* at 357–58. The court affirmed his conviction, stating,

> Nothing in this record suggests that the jury discussed, considered or tried to apply (despite the judicial admonition *not* to apply) what they were told about good conduct time and parole. Neither the prosecutor nor defense attorney discussed good conduct time in argument or urged the jury to assess a greater (or lesser) sentence based upon any potential good conduct time credit. The jury did not send out any notes indicating or expressing confusion about the possible application of good conduct time to appellant. Although appellant received the maximum sentence possible, life in prison, that is unsurprising given appellant's crime, his cavalier confession, and his abysmal prior criminal record.

---

[10]*Arnold* was decided on January 24, 1990; while it was pending, on November 7, 1989, the voters of this state approved amending the Texas Constitution to give the Legislature power to "enact parole laws and laws that require or permit courts to inform juries about the effect of good conduct time and eligibility for parole or mandatory supervision on the period of incarceration served by a defendant convicted of a criminal offense." Tex. Const. art. 4, § 11(a); *Luquis v. State*, 72 S.W.3d 355, 361 (Tex. Crim. App. 2002) (noting constitutional amendment).

19

*Id.* at 367–68. Like in *Luquis*, nothing in this record suggests that the jury discussed, considered, or tried to apply anything about good-conduct time, which was not discussed in voir dire, in opening statements, in the presentation of evidence, or in closing arguments and which did not result in any jury notes indicating or expressing confusion about it. *See id.* To the contrary, the second jury note indicates that the jury's concern was whether it had the responsibility to determine concurrent or consecutive sentences. Based on this record, the jury charge weighs against a finding of egregious harm.

### 3. Conclusion

Although Boykin received the maximum possible sentences, that is altogether unsurprising given the nature and results of his crimes: He destroyed his family by shooting his two children, causing them vicious, life-threatening injuries, in order to hurt his wife. Notwithstanding his mental health issues—which the voir dire responses indicate the jurors were unlikely to credit as an excuse—and his lack of a prior documented criminal record (as opposed to his unreported domestic violence incidents in both marriages), the jury was entitled to weigh Boykin's mitigation evidence against the body-camera footage graphically illustrating his children's injuries minutes after he shot them and their testimonies about that night and its aftermath to determine that he deserved the maximum sentences. *See Igo*, 210 S.W.3d at 647–48 (holding no egregious harm when, despite appellant's receiving maximum sentence for sexual assault of his

fifteen-year-old student, parole instruction contained standard curative language, parole was not mentioned by either party during punishment arguments, and the "evidence relating to punishment was exceptionally strong"—among other things, "[t]he jury could have viewed the sexual assault here as especially heinous because the victim was one of [his] students, and so the conduct was an abuse of [his] position as a teacher"). We overrule Boykin's sole issue.

### III.  Conclusion

We recently observed that the inclusion of outdated good-conduct instructions has not been an isolated event in the Tarrant County trial courts, *Garcia*, 710 S.W.3d at 364, and we strongly encourage the trial courts and attorneys practicing within this judicial district to review and update their jury charges. *See id.*  Having overruled Boykin's sole issue, we affirm the trial court's judgments.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  July 10, 2025